OPINION OF THE COURT
Jasen, J.
On this appeal, we are asked to decide whether the recorded statements of a third party inculpating the defendant in the crimes charged were properly admitted into evidence under the coconspirators’ exception to the hearsay rule. In resolving this issue, we must determine whether the use of these recorded statements violated defendant’s constitutional right “to be confronted with the witnesses against him.” (US Const, 6th Arndt; NY Const, art I, § 6.)
In the late summer months of 1976, Dr. Wallace B. Lehman, a Nassau County orthopedic specialist, contacted his attorney, Paul Goldberg, and informed him that a hearing was to be held by the Nassau County Medical Society to determine whether to suspend the doctor’s authority to treat patients under the Workers’ Compensation Law. Goldberg agreed to represent Dr. Lehman at the hearing. Although the Medical Society found that the charges against Dr. Lehman were without substance, the chairman of the Workers’ Compensation Board, Arthur Cooperman, determined that the doctor had violated various provisions of the law and accordingly announced the suspension of Lehman’s authority to treat patients under the law effective December 31,1976. Dr. Lehman, through his attorney, then decided to seek judicial review of this determination by way of an article 78 proceeding.
On December 15, 1976, Goldberg attended a dinner meeting sponsored by the New York State Society of Orthopedic Surgeons. After the meeting ended, Goldberg was introduced to the society’s counsel, defendant Sheldon Sanders. At that time, it was agreed that Goldberg and the defendant would appear as cocounsel in the Lehman v Cooperman proceeding.
On December 23,1976, Goldberg instituted an article 78 proceeding in Supreme Court, New York County, seeking to set aside the determination suspending Dr. Lehman’s authority to treat workers’ compensation patients. In addi *57 tion to filing the petition, Goldberg applied for an order staying the administrative determination. After filing these papers, Goldberg had a telephone conversation with the defendant in which the defendant told Goldberg that he had spoken to his “friend” and that his “friend” had told him he thought Goldberg’s request for a stay would be granted. In an earlier conversation, defendant had told Goldberg that he had a “friend” who was “one of the chief law assistants” at Supreme Court, New York County.
Goldberg’s request for a stay was granted on December 29, 1976. Approximately two weeks later, Goldberg again spoke with the defendant over the telephone. In this conversation, the defendant told Goldberg that he knew the stay would be granted because he paid his “friend who worked in Supreme Court, New York County” $250. When Goldberg exclaimed “You what?”, the defendant repeated that he had paid his “friend” $250 to obtain the stay.
After initially discussing the matter with certain members of the Committee on Grievances of the New York City Bar Association, Goldberg met with the New York County District Attorney on January 19,1977. Based on the information about the defendant provided by Goldberg, the District Attorney began an investigation into corruption in the New York County Supreme Court. Goldberg agreed to assist the District Attorney in this endeavor, and consented to having all his conversations pertaining to the investigation recorded.
On January 21, 1977, Goldberg, equipped with a recording device, met with defendant in his Nassau County office. At this meeting, defendant told Goldberg about a “friend” of his named “Abe Brown” who was “one of the chief opinion clerks in Special Term in New York County.” According to defendant, Brown was a “crook” who could give them anything they wanted “down there”, for example: “If you want to go to the Appellate Division, go to the Appellate Division. You want the motion lost in six months, it will be lost in six months. You want it decided in three weeks, it will be decided in three weeks.” Defendant stated that he had “dealt with Abe before” and, in fact, had called Brown concerning the Lehman v Cooperman proceeding. Defendant confirmed that, upon an earlier visit to *58 Brown’s house, he had paid Brown $250 in connection with Goldberg’s earlier application for a stay. Defendant also stated that Brown wanted $500 for “the rest of it.” When asked by Goldberg what Brown would do for this money, defendant responded: “We win * * * on the grounds that the Chairman was arbitrary and capricious.” Although the defendant was of the opinion that Goldberg would win the case even without paying Brown, defendant stated that, if it was his case alone, he “would do everything.” Defendant also cautioned Goldberg that their “clients haven’t got the slightest idea of any of this bullshit.” Later in the same conversation, defendant returned to the subject of Abram Brown and reminded Goldberg that he had “laid out $250” and suggested that this amount be added to their client’s bill. Goldberg replied that he would “think about it.”
Goldberg next spoke with the defendant on January 27, 1977. Defendant asked Goldberg whether he had decided to enlist the services of Brown. Goldberg replied that Brown “might be useful”, particularly in light of a motion Goldberg had made the day before to strike the answer that had been filed in the Lehman v Cooperman proceeding. Defendant agreed to contact Brown and arrange a meeting with Goldberg. Defendant told Goldberg that he would not be present at this meeting because he did not “want to be a broker in the deal” and that he did not “want any fall offs” or “commissions”.
Over the next few days, defendant made a number of unsuccessful attempts to contact Brown by telephone. On February 2, 1977, Goldberg called defendant’s office and was told by his secretary that defendant had left Brown’s telephone number, that Goldberg should call Brown, and that Goldberg should tell Brown that the defendant had told Goldberg to call. Goldberg followed defendant’s instructions and a meeting was scheduled with Brown the following day at Brown’s office. At this meeting, Brown told Goldberg that he was familiar with the case of Lehman v Cooperman since he had reviewed the original papers when they were filed and because he had discussed the matter with the defendant. Brown informed Goldberg that he “got the stay” by speaking to the “guy working with” the Judge who granted it. Brown then advised Goldberg *59 that the best course would be to delay the litigation, and told Goldberg that he would see what he could do in terms of losing the papers that had been filed. After leaving Brown, Goldberg called the defendant and told him about the meeting with Brown. When told by Goldberg that Brown had not mentioned “a number or an amount”, defendant said: “All right he’s afraid of you * * * I’ll talk to him tonight, I’ll tell him that he can have any transaction he wants directly with you.”
On February 4, 1977, defendant told Goldberg that he had spoken with Brown and that he would take care of everything. Defendant told Goldberg to “do what [Brown] tells you” and that the plan was to move the case “to the right people”. Later that same day, Goldberg sent the defendant a check in the amount of $125. This check was accompanied by a note in which Goldberg indicated that the $125 represented his “share of the disbursements” that they discussed earlier. According to Goldberg’s testimony at trial, the “disbursements” referred to the $250 that defendant had paid to Brown to obtain the stay. Goldberg’s $125 check was later returned in canceled'form, bearing the defendant’s indorsement.
On February 8, 1977, Brown informed Goldberg that he had spoken with the “guy” who was handling Goldberg’s motion to strike the answer in the Lehman v Cooperman proceeding and that there would be no problem. Two days later, the motion to strike was granted. On February 15, 1977, Brown again spoke with Goldberg and assured him that the granting of the motion to strike the answer would delay the proceeding until spring. Brown then suggested that they ought to give the “guy” who handled the matter a “certificate” of “one unit * * * American currency” and that “applicable taxes, handling charges and all that” could be taken care of at a later date. The next day, Goldberg went to Brown’s office and paid him $100 in cash.
In the conversations between Brown and Goldberg in the weeks that followed, Brown told Goldberg that the Lehman v Cooperman proceeding would continue to be delayed and that “everything’s progressing according to plan.” In one of these conversations, Brown warned Goldberg not to call him at his office unless Goldberg kept the conversation *60 “cryptic”. On March 23, 1977, Goldberg called the defendant and the defendant asked him how the “new deal” was working out. After Goldberg said “fine”, the defendant proclaimed that it was “a good connection”.
On May 11, 1977, Goldberg telephoned the defendant and told him that a cross petition had been filed by their adversary seeking to remove the Lehman v Cooperman proceeding to the Appellate Division. Defendant replied that Goldberg should “keep it in the Supreme Court” and “[l]et it drag” because he thought Goldberg had “a good situation down there.” Later that day, Goldberg called Brown and informed him about the attempt to remove the proceeding from Supreme Court. Brown also told Goldberg that he would be “better off down here” since there was “more control over the situation.” The next day, Brown was told by Goldberg that Brown’s “cousin” thought it best to keep the proceeding in Supreme Court and that his “cousin” was awaiting Goldberg’s decision.
Abram Brown was arrested on May 13, 1977. Ten days later, defendant told Goldberg over the telephone that it was “very important” for them to get together as soon as possible to discuss a matter involving their case. Defendant refused to talk with Goldberg over the telephone because he was concerned about the line being tapped. That night, Goldberg met the defendant outside his office building. Defendant asked Goldberg if he was “wired” and proceeded to frisk him, but was unsuccessful in locating the recording device hidden on Goldberg’s person. After alluding to Brown’s predicament, defendant said to Goldberg: “[T]he only thing that you and I have to be concerned about — I don’t think it’s a concern if nobody knows anything — is that $125 check you sent me for disbursements.” Defendant also assured Goldberg that the only people they had to worry about were each other. Defendant also asked Goldberg whether he had told another undercover agent by the name of “Beecher” that “me [the defendant] and Abe had a, you [Goldberg] and Abe had a transaction.” Goldberg replied that he had not told Beecher about their dealings with Brown.
In the weeks that followed, defendant attempted to reach Goldberg by telephone on several occasions. On June 9, *61 1977, Goldberg left a telephone number with defendant’s secretary. The number given by Goldberg was that of a telephone located in the wireroom of the District Attorney’s office. Later that evening, defendant called Goldberg at this number. After discussing the pending investigation by the Grand. Jury into the activities of Abram Brown, defendant requested that he and Goldberg meet so that their stories would be “consistent”. Goldberg told defendant that, in light of the investigation, they should not be seen together. Goldberg also stated that he planned to answer the Grand Jury’s questions. Defendant replied that, although he was fearful of losing his license to practice, he too would tell the District Attorney that he “had a dealing with Abe Brown” and that Goldberg “reimbursed [defendant] for it * * * or part of it.”
Defendant was indicted for conspiracy in the third degree (Penal Law, former § 105.05), three counts of bribery in the second degree (Penal Law, § 200.00) and one count of criminal facilitation in the second degree (Penal Law, former § 115.00). Because Abram Brown had died shortly after his arrest, his recorded conversations with Goldberg were admitted into evidence, over objection at defendant’s trial as statements made in the course and furtherance of a conspiracy.* The jury found defendant guilty of conspiracy to commit bribery and two counts of bribery in the second degree. Defendant was sentenced to concurrent three-year indeterminate terms on the two bribery counts and to 90 days’ imprisonment on the conspiracy count. The Appellate Division unanimously affirmed defendant’s convictions, without opinion, and leave to appeal was granted by an Associate Judge of this court.
Defendant contends, among other things, that Brown’s recorded statements should not have been admitted into evidence because they did not qualify as declarations of a coconspirator. Defendant further asserts that even if *62 Brown’s statements otherwise satisfy the requirements of this exception to the hearsay rule, the use of these declarations as evidence against him violated his constitutional right of confrontation. We disagree.
In this State, it has long been settled that the declarations of one coconspirator made in the course and furtherance of a conspiracy are admissible against all other coconspirators as an exception to the general rule against hearsay. (People v Berkowitz, 50 NY2d 333, 341; People v Salko, 47 NY2d 230,237-238; People v Rastelli, 37 NY2d 240,244, cert den 423 US 995; see, also, McCormick, Evidence [2d ed], § 267, pp 645-646; Richardson, Evidence [10th ed — Prince], § 244.) The coconspirators’ exception is predicated primarily on the theory of vicarious admission, to wit: parties engaged in a criminal partnership are bound by one another’s declarations to the same extent that a principal is bound by the declarations of his agent. (People v Salko, supra, at p 237; cf. People v McGee, 49 NY2d 48, 57 [overt act of one coconspirator attributable to other to establish offense of conspiracy].) However, before evidence can be admitted against a defendant under this hearsay exception, the People must establish, by prima facie proof, the existence of a conspiracy between the declarant and the defendant “without recourse to the declarations sought to be introduced.” (People v Salko, supra, at p 238.)
Applying these principles to the facts of this case, we conclude that, as an evidentiary matter, the trial court did not abuse its discretion by admitting Brown’s recorded statements under the coconspirators’ exception to the hearsay rule. A review of the record reveals, among other things, that the defendant, while acting as cocounsel in the Lehman v Cooperman proceeding, not only discussed the case with Brown on various occasions, but by his own admissions paid Brown $250 in order to obtain favorable treatment in connection with the stay application. In addition, defendant was the individual who told Goldberg that the proceeding could be won by paying Brown an additional $500. Defendant also arranged the initial meeting between Brown and Goldberg, and thereafter called Brown in order to make certain that the Lehman v Cooperman proceeding would receive the appropriate treatment. Be *63 yond this, defendant told Goldberg to follow Brown’s instructions, that “[everything [would] be taken care of”, and that Brown’s plan was to move the case to the “right people”. In short, independent of the recorded statements made by Brown, defendant’s conversations with Goldberg alone contain prima facie proof of the existence of a joint criminal enterprise between the defendant and Brown to improperly influence the outcome of a case for profit. That being so, the statements made by Brown in .the course and furtherance of that conspiracy were properly admitted into evidence against the defendant.
Having established that Brown’s statements were properly admitted into evidence under the coconspirators’ exception to the hearsay rule, it becomes necessary to resolve the remaining question whether the use of these statements at trial was violative of defendant’s constitutional right of confrontation. In our view, there was no impairment of defendant’s right to confront the witnesses against him.
Both the Federal and State Constitutions guarantee an accused the right at trial “to be confronted with the witnesses against him.” (US Const, 6th Amdt; NY Const, art I, § 6; see Pointer v Texas, 380 US 400, 406.) If applied literally, this right would require the exclusion at trial of all out-of-court statements where the declarant was unavailable for cross-examination. Yet, the confrontation clause has never been interpreted in such a way as to mandate the wholesale abrogation of the hearsay exceptions at a criminal trial. (Ohio v Roberts, 448 US 56, 63; Dutton v Evans, 400 US 74, 80; Pointer v Texas, 380 US 400, 407, supra.) Indeed, various types of extrajudicial statements have been recognized as admissible evidence notwithstanding the absence of an opportunity to confront and cross-examine the declarant. (E.g., Mattox v United States, 156 US 237, 243-244; People v Corey, 157 NY 332, 347-348 [dying declarations]; People v Del Vermo, 192 NY 470 [spontaneous declarations]; Dutton v Evans, 400 US 74, supra; People v Salko, 47 NY2d 230, 241, supra [statements of coconspirator]; People v Sugden, 35 NY2d 453, 460; People v Nisonoff, 293 NY 597, 601-603 [business and public records].)
*64 While the Supreme Court has recognized that “hearsay rules and the Confrontation Clause are generally designed to protect similar values” (California v Green, 399 US 149, 155) and “stem from the same roots” (Dutton v Evans, 400 US 74, 86, supra), the court has also been quick to acknowledge that the two are not entirely equatable. The confrontation clause is, therefore, something more than a mere “codification of the rules of hearsay and their exceptions as they existed historically at common law.” (California v Green, supra, at p 155.) Nevertheless, the court has continuously declined the invitation to adopt any definitive standard that would govern the relationship between the confrontation clause and the various exceptions to the hearsay rule. (See Ohio v Roberts, 448 US 56, 66, n 9, supra.)
In its most recent excursion into this area, the Supreme Court outlined a two-pronged approach for determining whether evidence, admissible under an exception to the hearsay rule, may be received without violating the confrontation clause. First, the hearsay declarant must be “unavailable” at the time of trial. Second, the statement to be admitted must bear “indicia of reliability” sufficient to “ ‘afford the trier of fact a satisfactory basis for evaluating the truth of the prior statement’ ” even in the absence of cross-examination. (Ohio v Roberts, supra, at pp 65-66 [quoting California v Green, 399 US 149, 161, supra].) The court also observed that “[Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception.” (Ohio v Roberts, supra, at pp 66.)
Although the coconspirators’ exception has been part of the settled law of this State for quite some time (e.g., People v Davis, 56 NY2d 95; Cuyler v McCartney, 40 NY 221), we need not and do not adopt in this case a rule by which every extrajudicial statement qualifying under this exception to the hearsay rule is admissible at a criminal trial notwithstanding the constitutional right of confrontation. On the other hand, defendant has not advanced any reason which would cause us to recognize a State constitutional right of confrontation broader than the Sixth Amendment guarantee as interpreted by the Supreme *65 Court. We confine ourselves, therefore, to deciding the case before us.
Applying the two-pronged test of Ohio v Roberts (supra) to the facts of this case, no person can be more “unavailable” for cross-examination than one who has died prior to trial. Furthermore, the circumstances surrounding Brown’s statements provided the jury with the “indicia of reliability” necessary for a proper evaluation of the truth of these declarations even without the aid of cross-examination.
In the first place, Brown’s conversations with Goldberg were memorialized on tape. As a result, there was no question at trial that he actually uttered the statements in issue. Second, Brown had personal knowledge concerning the matters about which he spoke, and there is no possibility that his statements were based on faulty recollection. Third, at the time these statements were made, Brown had no motive to lie since he believed that he was speaking in confidence to a cohort engaged in a joint criminal enterprise. (Cf. Chambers v Mississippi, 410 US 284, 300; Dutton v Evans, 400 US 74, supra; People v Salko, 47 NY2d 230, supra.) Fourth, Brown’s statements were independently corroborated, to some extent, by defendant’s conversations with Goldberg, as well as by the events that transpired during the Lehman v Cooperman proceeding. Finally, the fact that these extrajudicial statements directly implicated Brown in a joint criminal enterprise provides additional assurance of their trustworthiness. (See Chambers v Mississippi, supra, at pp 300-301.)
In short, given the clear necessity of using the tapes due to Brown’s death and in view of the independent “indicia of reliability” surrounding his declarations, the admission into evidence of these recorded statements did not violate defendant’s constitutional right of confrontation. To paraphrase somewhat, “the possibility that cross-examination of [Brown] could conceivably have shown the jury that the statements], though made, might have been unreliable was wholly unreal.” (Dutton v Evans, 400 US 74, 89, supra.)
While defendant asserts a variety of other contentions in support of reversal, only one requires a brief discussion. *66 Prior to the recording of defendant’s conversation with Goldberg on June 9, 1977, defendant had retained counsel in connection with his appearance before the Grand Jury investigating Brown’s activities, and this fact was conveyed to both the District Attorney and to Goldberg. Under these circumstances, the recorded statements of June 9 were taken in violation of defendant’s right to counsel (see People v Skinner, 52 NY2d 24) and, therefore, the conversation should have been suppressed.
Contrary to the People’s assertion, the defendant did not waive his right to judicial determination of this claim since he made a pretrial motion to suppress all the recorded conversations. True, a motion to suppress is, by statute, “the exclusive method of challenging the admissibility of evidence upon the grounds specified in setion 710.20” (emphasis supplied), and, in the absence of such a motion, a defendant “waives his right to judicial determination of any such contention.” (CPL 710.70, subd 3.) One of the grounds for suppression specified in CPL 710.20 is that the evidence sought to be admitted consists of or describes a statement by the defendant “involuntarily made, within the meaning of section 60.45, to a public servant engaged in law enforcement activity or to a person then acting under his direction or in cooperation with him.” (CPL 710.20, subd 3.) A statement is “involuntarily made” when, among other things, it is obtained “in violation of such rights as the defendant may derive from the constitution of this state”. (CPL 60.45, subd 2, par [b], cl [ii] [emphasis supplied].) Thus, absent a motion to suppress, there is no error to be reviewed on appeal. Here, although defendant’s motion to suppress was predicated on the ground that the conversations were obtained as the result of an illegal wiretap and even though the right-to-counsel claim was never raised at the trial level, this claim is so fundamental that it may be raised for the first time on appeal. (See, e.g., People v Carmine A., 53 NY2d 816, 818; People v Ermo, 47 NY2d 863, 865.)
Nevertheless, we conclude that any error occasioned by the failure to suppress defendant’s statements of June 9 was harmless beyond a reasonable doubt. The record contains overwhelming proof of defendant’s guilt. Moreover, *67 contrary to defendant’s suggestion, this was not the only conversation in which he admitted his involvement with Brown. In fact, in the conversations of early January, 1977, and of January 21, 1977, both occurring prior to defendant retaining counsel, defendant told Goldberg that he had paid Brown $250 in connection with Goldberg’s pending stay application. These admissions, coupled with the other references to Brown throughout the conversations between defendant and Goldberg, all of which were taped prior to defendant retaining counsel, clearly established defendant’s involvement with Brown beyond any doubt. Defendant’s statement on June 9 to the effect that he “had a dealing with Abe Brown” was merely cumulative for it was, at most, the mere reiteration of a fact that had already been made abundantly clear to the jury by the other untainted conversations and evidence properly received at trial. Under these circumstances, there is no reasonable possibility that the erroneous admission of the June 9 conversation contributed to defendant’s convictions. (See People v Crimmins, 36 NY2d 230, 237; see, also, Milton v Wainwright, 407 US 371; see, generally, Kamisar, La Fave and Israel, Modern Criminal Procedure [5th ed], pp 809-818.)
Accordingly, the order of the Appellate Division should be affirmed.

 Brown’s recorded statements were also admitted into evidence as declarations against his penal interests. (See People v Maerling, 46 NY2d 289, 295-299; People v Settles, 46 NY2d 154,166-167; New York Proposed Code of Evidence, § 804, subd [b], par [3]; see, generally, Richardson, Evidence [10th ed — Prince], §§ 255-266.) Inasmuch as the admission of Brown’s statements can be sustained under the coconspirators’ exception, we do not address the applicability of any other hearsay exception to the facts of this case.