THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v THEODORE PERSICO, JR., Appellant.

First Department, May 22, 1990

APPEARANCES OF COUNSEL

*Hillary Hassler* of counsel *(Mark Dwyer* with her on the

brief; *Robert M. Morgenthau, District Attorney,* attorney), for respondent.

*Judd Burstein* for appellant.

### OPINION OF THE COURT

MURPHY, P. J.

The defendant, Theodore Persico, Jr., has been convicted, after a jury trial, of one count of conspiracy in the second degree and three counts of criminal sale of a controlled substance in the first degree. The evidence presented at Mr. Persico's trial indicated that on three occasions in June of 1986, Mr. Persico had supplied quantities of cocaine to a dealer named Vincent Lafaro who thereupon sold the cocaine to an undercover detective by the name of Berger.

The first of these transactions occurred on June 3, 1986. On that date, Berger telephoned Lafaro and requested three ounces of cocaine. Twenty minutes later Berger arrived at Lafaro's apartment and was advised by Lafaro that he, Lafaro, would call "his guy" to order the three ounces. Lafaro then placed a call to a beeper number and punched a return number into a digital phone. While waiting for the return call, Berger heard Lafaro mutter, "Teddy call already." Minutes later the phone rang. Referring to the caller as "Teddy", Lafaro ordered three ounces of cocaine and arranged to meet the caller at his house in 10 or 15 minutes. Upon concluding the phone conversation, Lafaro informed Berger that they would go to his (Lafaro's) "guy's house to pick up the stuff." Berger then gave Lafaro $4,500, the agreed-on price for the cocaine, and the two men rode in Lafaro's car to the place where the transaction was to be completed. In 10 minutes, Lafaro and Berger arrived at defendant's house. Lafaro rang the doorbell, but no one answered. Shortly, however, defendant appeared driving a white Corvette. He emerged from the car carrying a white plastic bag and approached Lafaro who was waiting by the door. Five minutes after entering the house with the defendant, Lafaro reappeared, momentarily accompanied by the defendant, carrying a brown paper bag. The bag, which Lafaro immediately transferred to Berger, contained nearly three ounces of packaged cocaine. On the way back to Lafaro's apartment, Berger asked Lafaro whether his "guy" had had the cocaine in the house or had brought it with him. Lafaro replied that the cocaine had been brought.

Just over two weeks later, on June 19, 1986, Berger again

called Lafaro and told him that he would be at Lafaro's in 15 minutes to pick something up. About 20 minutes after this phone call, minutes before Berger's arrival, the defendant appeared in front of Lafaro's house in his white Corvette. He was observed by a police surveillance team exiting his car carrying a small white bag. He then met Lafaro at the front door of Lafaro's apartment building. It was at this point that Berger arrived. As Berger walked toward the front door, he passed the defendant who was on his way back to his car, empty-handed. Berger asked the defendant whether Vinnie (Lafaro) was there but received no answer from the defendant, who continued toward his car. Moments later, Berger made his way to the door where Lafaro was waiting. Lafaro was holding a small plastic bag which he opened for Berger's examination; inside were three plastic bags of cocaine. Berger immediately informed Lafaro that he wanted five ounces whereupon Lafaro yelled out, "Hey, Teddy", and ran after the defendant. A short discussion between Lafaro and the defendant ensued. Thereafter, the defendant drove away and Lafaro told Berger that "the guy" would return shortly with two more ounces. While waiting for the additional two ounces, Berger inquired whether the driver of the Corvette had been Lafaro's supplier for this as well as the earlier June 3 transaction. Lafaro replied that he had. Eventually, Berger became impatient and asked "What's with this Teddy?" Lafaro then placed a phone call, asking the person on the other end of the line, "Hey, Teddy * * * you going to come?" After hanging up, Lafaro informed Berger that "Teddy" had sent his "kid". Minutes later, an unidentified individual driving the defendant's Corvette arrived at Lafaro's apartment house. Lafaro met him outside. He returned to the apartment momentarily with the two additional ounces of cocaine.

With the exception of Berger's initial phone call, the June 19 transaction was tape recorded by means of a Kell transmitting device concealed in Detective Berger's billfold.

The third transaction took place on June 25, 1986. In a phone conversation held on the evening of that day Berger advised Lafaro that he wanted to purchase five more ounces of cocaine. The two agreed to meet at 10:00 P.M. Berger arrived at Lafaro's apartment at 10:25 P.M., again equipped with a Kell transmitter. At 10:40 P.M., a backup surveillance unit videotaped the defendant arriving in front of Lafaro's apartment house driving a white Toyota. In response to the sound of a car horn, Lafaro went to the window of his second-story

apartment and yelled, "I'll be right down, Ted." The defendant who was carrying a small white package looked up to the window and waved. Lafaro then left the apartment and let the defendant who was still carrying the package, into the vestibule. Shortly afterward, the defendant returned empty-handed to the Toyota and Lafaro returned to the apartment carrying a clear plastic bag with almost five ounces of cocaine. For several minutes, while defendant waited in the Toyota, Berger and Lafaro haggled over the price of the cocaine. When the price had been set at $7,150 and the money counted, Lafaro took the cash and went outside to where the Toyota was parked. He was observed passing something through the open passenger window of the Toyota.

Subsequent to these transactions, Lafaro made certain statements to Berger indicating that either "Teddy" or "Persico" had been his source for the cocaine sold to Berger. Berger testified that on July 18, 1986 Lafaro told him in an unrecorded conversation that "Teddy" was a cocaine source and had supplied the cocaine sold to Berger "the last time" (i.e., June 25, 1986). Berger also testified that on September 24, 1986 Lafaro told him that he had to pay "taxes" to his guy "Persico" who was with "big people in Brooklyn."

Defendant's most substantial arguments on appeal relate to the circumstance that Vincent Lafaro was not called by the People to testify. It is defendant's principal contention that although Lafaro was not called to the witness stand, he was in fact a "star witness" for the prosecution since his extrajudicial declarations, as recounted in the testimony of Detective Berger, were used to secure his conviction. While conceding that there exists no viable hearsay objection to the admission of Lafaro's statements since, a prima facie case of conspiracy having been made out, the statements, made in furtherance of the conspiracy, fell within the coconspirator exception to the hearsay rule, the defendant maintains that the statements were, nevertheless, inadmissible, because their reception in Lafaro's absence violated the defendant's constitutional right to confront witnesses against him. The issue posed by this appeal then is whether the Confrontation Clause does require the exclusion of otherwise admissible coconspirator hearsay when the declarant does not himself testify on the People's case and, therefore, cannot be cross-examined.

The Confrontation Clause and the various exceptions to the hearsay rule do not coexist easily, for once it is admitted, as it has been, that a hearsay declarant may be considered a

witness within the meaning of the Confrontation Clause, it follows, as a matter of logic, that all hearsay must be excluded when the declarant is not present to testify. Pragmatism rather than unyielding logic, however, has characterized the relation between the hearsay exceptions and the Confrontation Clause and in cases where the declarant is unavailable and the hearsay exception is justified by the inherent reliability of the declarations to be admitted thereunder, the admission against the defendant of extrajudicial statements made by an absent declarant has not been found to offend the confrontation rights of the accused. It is reasoned that the principal objective of confrontation, namely, assuring the reliability of the evidence underlying the judgment, is sufficiently protected when the evidence is of a kind reliable by nature.

The courts of this State have never expressed the view that declarations admissible under the coconspirator exception to the hearsay rule are, as a class, so reliable that their admission will never violate the defendant's constitutionally based right of confrontation. Indeed, in *People v Sanders* (56 NY2d 51, 64 [1982]), the Court of Appeals observed, "[A]lthough the coconspirators' exception has been part of the settled law of this State for quite some time (e.g., *People v Davis,* 56 NY2d 95; *Cuyler v McCartney,* 40 NY2d 221), we need not and do not adopt in this case a rule by which every extrajudicial statement qualifying under this exception to the hearsay rule is admissible at a criminal trial notwithstanding the constitutional right of confrontation". Of course, at the time *Sanders* was decided it was widely thought that the Confrontation Clause generally required the actual presence of a prosecution witness at trial unless the prosecution could show that the witness was unavailable and that the hearsay to be admitted in the witness's absence, under some exception to the hearsay rule, was reliable. This, in any case, was the rule apparently set forth by the Supreme Court in *Ohio v Roberts* (448 US 56, 66 [1980]) where Justice Blackmun writing for the majority stated: "[I]n sum, when a hearsay declarant is not present for cross-examination at trial, the Confrontation Clause normally requires a showing that he is unavailable. Even then, his statement is admissible only if it bears adequate 'indicia of reliability.' Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthi-

ness". This approach, seemingly generally mandated in assessing whether the admission of hearsay would be violative of a criminal defendant's constitutional right to confront witnesses against him, was, of course, followed in *Sanders (supra)*, where the Court of Appeals, applying the test set forth in *Ohio v Roberts*, ruled that the admission of a coconspirator's extrajudicial declarations did not violate the defendant's right of confrontation: the declarant was dead and, therefore, unavailable to testify, and the statements themselves bore adequate indicia of reliability.

While the Court of Appeals, in the decade since its decision in *Sanders (supra)*, has given no indication that the approach there taken is no longer to be followed, decisions on the Federal level have made it clear that *Ohio v Roberts (supra)* did not have the broad significance that many courts, including the *Sanders* court, naturally attributed to it.

In *United States v Inadi* (475 US 387 [1986]), the Supreme Court held that the unavailability of a nontestifying coconspirator need not be shown as a condition of admitting his or her out-of-court statements at trial. The court distinguished *Ohio v Roberts (supra)* on the ground that the out-of-court statements there at issue came in the form of prior testimony rather than coconspirator declarations. It was the court's view that prior testimony was but a weak substitute for live testimony and that live testimony was therefore to be preferred and, indeed, required, when available. There was no similar preference for live testimony where coconspirator declarations were concerned because coconspirator declarations, far from being weak substitutes for live testimony, were thought by the court to be "irreplaceable" substantive evidence of the conspiracy, generated at a time when the various inducements to fabrication present once the prosecution of the conspiracy was underway, did not yet exist. To do without such "irreplaceable" evidence simply because the live testimony of an available declarant had not been offered by the government would, said the court, be " 'clear folly' " *(supra,* 475 US, at 394-397).

Soon after its decision in *Inadi (supra),* the Supreme Court in *Bourjaily v United States* (483 US 171, 183 [1987]) determined that out-of-court statements admissible under the Federal coconspirator exemption to the hearsay rule fell within a " 'firmly rooted hearsay exception' " and were, therefore, of a kind sufficiently reliable to satisfy the demands of the Confrontation Clause without any "showing of particularized

guarantees of trustworthiness" *(see, Ohio v Roberts, supra,* at 66).

As the defendant virtually concedes, and as is in any case clear beyond argument, the combined effect of *Inadi* and *Bourjaily (supra)* is to foreclose any Federal constitutional challenge to the admission of the statements at issue. The question remains, however, whether the Confrontation Clause of the NY Constitution affords the defendant greater protection than may be had under the parallel provision of the Federal Constitution. As noted, the Court of Appeals has never shown any inclination to narrow the right of confrontation as was done in *Inadi* and *Bourjaily.* So far as can be discerned from this State's precedents, *Sanders (supra)* remains good law and it would appear that the test set forth in *Sanders* for judging the admissibility of coconspirator hearsay has, in fact, retained some currency in recent intermediate appellate decisions *(see, People v Claytor,* 137 AD2d 760 [1988]; *People v Negron,* 122 AD2d 894 [1986], *lv denied* 69 NY2d 714) notwithstanding the aforecited Federal precedents indicating that, as matter of Federal constitutional doctrine, the test is unnecessary. While *Sanders* apparently construed the mandate of *Ohio v Roberts (supra)* too broadly, it does not follow that the reasoning of the decision was unsound. There would appear to be compelling reasons for retaining, as a matter of State constitutional doctrine, the limitations imposed by *Sanders* on the use of coconspirator hearsay.

The essential purpose of confrontation is, of course, to assure the reliability of the evidence upon which the judgment is based. This purpose is achieved primarily by means of cross-examination, long acknowledged to be the most effective method for testing the credibility of a declarant and the reliability of his or her evidence *(see, Ohio v Roberts, supra,* at 63; *Davis v Alaska,* 415 US 308, 315; *Bruton v United States,* 391 US 123, 126; *Pointer v Texas,* 380 US 400, 406-407; *California v Green,* 399 US 149, 158).

The Constitution reflects a strong preference for the use of cross-examination in assessing evidentiary reliability when it categorically commands that a defendant "shall * * * be confronted with the witnesses against him" (NY Const, art I, § 6). The language of the clause would seem to require, at a minimum, that available witnesses against a criminal defendant be produced by the government, for when the declarant is not present to testify there can be no cross-examination, hence, the principal safeguard against the fact finder's unqual-

ified receipt of unreliable evidence is removed. The reason then, for requiring the production of available government witnesses, is not fundamentally that in-court testimony is better evidence of the crime charged than extrajudicial statements, although that may sometimes be a consideration; it is rather that a declarant's statements, whether made in or out of court, may not be trustworthy and should, therefore, be tested before the fact finder by means of cross-examination. Given the critical importance of cross-examination to the end which the Confrontation Clause exists to insure, namely, the integrity of the truth-seeking process, the only possible rationale for dispensing with it is that the statements to be admitted in the declarant's absence are so reliable as to make the cross-examination of the declarant unnecessary.

It would seem plain that the declarations of coconspirators are not so invariably reliable that they may be categorically received without the cross-examination of the declarant. While the importance of coconspirator declarations as evidence of the conspiracy is not to be doubted, the declarations are not, therefore, reliable. It is true that coconspirators are not, at the time of the conspiracy, subject to the particular inducements to fabrication present in the context of a prosecution; they will not yet be tempted to seek exoneration or leniency at the expense of their former partners in crime. No one would suggest, however, that, but for the near prospect of penal sanctions, criminals are otherwise to be trusted. As one commentator has so aptly observed, "[c]onspirators' declarations are good to prove that some conspiracy exists but less trustworthy to show its aims and membership. The conspirator's interest is likely to lie in misleading the listener into believing the conspiracy stronger with more members (and different members) and other aims that in fact it has. It is no victory for common sense to make a belief that criminals are notorious for their veracity the basis for law" (Levie, *Hearsay and Conspiracy,* 52 Mich L Rev 1159, 1165-1166 [1954]). Quite apart from the very serious questions which must arise respecting the credibility of conspirators who have "demonstrated [a] determination deliberately to further self-interest at the expense of society" *(People v Sandoval,* 34 NY2d 371, 377), the declarations of coconspirators are likely to be fraught with inaccuracies. Because the extent and workings of a criminal conspiracy are often not fully revealed to the individual conspirators, a conspirator's statements about the conspiracy and its members are likely to reflect incomplete or errone-

ous knowledge. These statements will often proceed from something less than firsthand experience and may be based on little more than rumor. It has also been observed that the statements of conspirators, no less, and perhaps more, than others, contain ambiguities. Without the benefit of cross-examination, the fact finder may never learn the basis of the assertion whose truth has been pressed upon it or the precise sense the assertion was meant to convey.

In view of the many reasons for doubting the veracity of conspirators' statements, it is hardly surprising that the coconspirator exception to the hearsay rule has never been persuasively justified by the reliability of the statements to be admitted thereunder. Indeed, the rationale most often advanced to explain the exception has nothing to do with reliability. It treats conspiracy as a sort of agency in which each participant bears responsibility for, or is estopped from denying, the statements of others made in furtherance of the conspiracy. It is, however, recognized that "the agency theory of conspiracy is at best a fiction" (Notes of Advisory Comm on Rules on Fed Rules Evid, rule 801 [d] [2] [E], reprinted at 28 USCS Appendix, at 688 [1988]). While it may seem fitting, as a matter of substantive law and policy that conspirators be held accountable for each others' words and acts in furtherance of the conspiracy, the reality is that conspirators rarely authorize the statements of their coconspirators and it is doubtful whether there is justification for a rule of evidence which, on the basis of nothing more than dubious imputation, would permit the introduction of hearsay, particularly coconspirator hearsay; for, even if made during the pendency and in furtherance of a conspiracy, the statements of coconspirators may still be highly unreliable. "The agency argument * * * fails because it shows no reason for exempting conspirators' utterances from the hearsay rule. To say that the substantive law does so only begs the question. The rules of agency govern the substantive law of conspiracy; they decide who is a member of the conspiracy. As such they are involved in determining *against whom* the evidence may be admitted. The point is that they are not relevant in determining *why* it should be admitted" (Levie, *Hearsay and Conspiracy,* 52 Mich L Rev 1159, 1165 [emphasis in original]).

As can be seen, the coconspirator exception to the hearsay rule rests upon the shakiest of theoretical foundations. While the exception may be enduring, having been recognized by the Supreme Court in the early nineteenth century *(see, United*

*States v Gooding,* 12 Wheat [25 US] 460 [1827]), its vintage alone does not warrant characterizing it as "firmly rooted". As Justice Blackmun, the author of the "firmly rooted" language *(see, Ohio v Roberts, supra,* 448 US, at 66), explained in his *Bourjaily* dissent *(see, Bourjaily v United States, supra,* 483 US, at 199-202), and as is in any case clear from the context in which the language first appeared, a hearsay exception only lends itself to description as "firmly rooted" when the sort of statements coming within its definition are inherently reliable, something which is emphatically not the case with coconspirator declarations *(see,* Note, *Federal Rule of Evidence 801 [d] [2] [E] and the Confrontation Clause: Closing the Window of Admissibility for Coconspirator Hearsay,* 53 Fordham L Rev 1291, 1306-1307).

In the end, it is probably the prosecution's need of evidence which has provided the most convincing reason for the coconspirator hearsay exception, but while prosecutorial need may provide a rationale for the evidentiary exception, it provides no basis to dispense with the constitutionally guaranteed right of the accused to confront and cross-examine his or her accusers. As has often been observed, although the hearsay rule and its exceptions in many respects serve ends similar to the Confrontation Clause, the two are not always equatable *(see, California v Green,* 399 US 149, *supra; Dutton v Evans,* 400 US 74, 86-87; *People v Sanders, supra,* 56 NY2d, at 64). Where exceptions to the hearsay rule have evolved, and are ultimately to be justified, more out of need than considerations of reliability, the evidentiary rule and the Confrontation Clause diverge, and where they are divergent it is the values constitutionally enshrined in the Confrontation Clause that must govern. This is precisely the situation when hearsay is sought to be admitted pursuant to the coconspirator exception; the reliability of the hearsay which is in no way assured by the nature of the declarations falling within the exception, must be tested, where possible, by means of confrontation and, most particularly, cross-examination.

If the need for coconspirator hearsay were a relevant consideration in determining whether the unqualified command of the Confrontation Clause was to be abided, and really it is not, it would seem entirely sufficient that *Sanders (supra)* permits the introduction of demonstrably reliable hearsay when the declarant is not available to testify. The rule set forth in *Sanders* then imposes no evidentiary hardship upon

the prosecution. If the declarant is available, he or she will testify and the hearsay will be admitted. If the declarant is unavailable, the hearsay will be admitted anyway, provided it is reliable. Certainly, the prosecution's need could never justify placing the unreliable statements of an absent declarant before the trier of fact. That would be a circumstance violative not only of the letter of the Confrontation Clause but of the values which lie at its core. Undoubtedly, there will be situations in which the prosecution will, as a strategic matter, prefer not to produce the declarant. But the Confrontation Clause does not accommodate such gamesmanship. If the prosecution wishes to enjoy the benefit of coconspirator hearsay, it must also assume the risk that cross-examination of the declarant will show the hearsay to be untrustworthy.

Turning now to the facts of the present case, it is immediately apparent that Vincent Lafaro was an available witness and that his hearsay declarations ought not to have been admitted in his absence. By the time of defendant's trial, Lafaro had become a government informant and the record discloses absolutely no reason why the People could not have called him to the witness stand. Indeed, the People make no argument that Lafaro was unavailable, they simply maintain that, after *Inadi* (475 US 387, *supra),* there is no requirement that an available coconspirator declarant be produced as a condition of admitting his hearsay declarations. As noted, while this is certainly true as a matter of Federal constitutional doctrine, the State Constitution, for very sound reasons, would appear to require that the issue be resolved differently.

In light of the fact that the error is of constitutional magnitude, it must be shown harmless beyond a reasonable doubt if the conviction is to be allowed to stand *(Chapman v California,* 386 US 18; *Fahy v Connecticut,* 375 US 85; *People v Crimmins,* 36 NY2d 230, 237). While this is concededly a difficult determination to make given the exacting standard to be applied, a conscientious review of the lengthy trial record discloses that the properly admitted evidence against the defendant was absolutely overwhelming and we do not think that there is any reasonable possibility that the jury would have reached a different verdict had the error not occurred.

In assessing the impact of the error, it is relevant to note that defendant cites only two out-of-court statements whose admission is claimed to have violated his right of confronta-

tion.[1] One of these, Lafaro's September 24, 1986 statement to the effect that he paid "taxes" to his guy "Persico" who was with "big people in Brooklyn", was properly struck by the trial court and need not concern us on appeal, particularly since the court gave a very strong curative instruction.[2] The remaining statement, made on July 18, 1986, in which Lafaro reportedly informed Berger that "Teddy" had supplied the cocaine sold to Berger on June 25, 1986, could not have prejudiced the defendant. The properly admitted proof of each of the three transactions for which the defendant was convicted, including of course the transactions of June 25, 1986, was so compelling that the challenged statement was ultimately practically superfluous. As noted, the evidence showed that on three occasions in June of 1986 Berger had contacted Lafaro and asked to purchase drugs. On each occasion, the defendant appeared shortly before the transaction was consummated carrying a bag, and on each occasion, Lafaro met with the defendant and immediately thereafter transferred quantities of cocaine to Berger. The particular circumstances of each of these transactions as set forth in the above-summarized testimony of Detective Berger and the members of the police surveillance teams, and as reflected in audio and videotapes, could have left no conceivable doubt that the defendant was in fact the supplier of the drugs Berger purchased from Lafaro.

The conclusion that the erroneous admission of the challenged hearsay was harmless is additionally compelled by the fact that the hearsay was ultimately shown to be reliable; its truth was amply and independently corroborated by the properly admitted evidence in the case.

In addition to his constitutional claim, defendant makes several less consequential arguments. Even if these arguments possessed merit, which they do not, they would not, in light of the overwhelming evidence of guilt, be sufficient to require a reversal.

Accordingly, the judgment of the Supreme Court, New York

---

1. Although there were obviously many more than two out-of-court statements by Lafaro entered in evidence, most of Lafaro's statements do not fall within the definition of hearsay (i.e., they were not offered for the truth of their assertions), and, presumably for this reason go unchallenged.

2. The court instructed the jury: "alleged payment of taxes to certain people, including one of these defendants * * * [that] conversation was improperly elicited by the prosecutor and I direct you to disregard all such testimony and strike it from your minds completely."

County (Leslie Crocker Snyder, J.), rendered on June 29, 1988, convicting the defendant, after a jury trial, of one count of conspiracy in the second degree, and three counts of criminal sale of a controlled substance in the first degree, and sentencing him, as a second felony offender, to concurrent indeterminate terms of from 20 years to life on the sale counts and from 12½ to 25 years on the conspiracy count, should be affirmed.

SULLIVAN, CARRO, MILONAS and SMITH, JJ., concur.

Judgment, Supreme Court, New York County, rendered on June 29, 1988, unanimously affirmed.