Wayne HAYWOOD, Petitioner,

v.

Leonard PORTUANDO, Superintendent, Shawangunk Correctional Facility, Respondent.

No. 02 Civ. 890 JSR GWG.

United States District Court, S.D. New York.

Sept. 19, 2003.

Joseph M. Nursey, Office of the Appellate Defender, New York City, for petitioner.

Christopher John Blira-Koessler, Office of the District Attorney, Bronx County, Bronx, NY, for respondent.

## ORDER

RAKOFF, District Judge.

On March 21, 2003, the Honorable Gabriel W. Gorenstein, United States Magistrate Judge, issued a Report and Recommendation in the above-captioned matter recommending that petitioner's motion under 28 U.S.C. § 2254 for a writ of habeas corpus be denied and that his petition be dismissed. Both petitioner and the State of New York timely filed objections to the Report and Recommendation.

Having reviewed the record and the issues *de novo*, and having considered the objections, the Court hereby adopts the Report and Recommendation, but with the following clarification: On page 18 of the Report and Recommendation, Judge Gorenstein states that "[t]he record does not reflect that any of the other unstruck venirepersons up to that point had been the victim of a violent crime or had a close relative who had been the victim of a violent crime." In fact, however, it appears that the sidebars during *voir dire* questioning of prospective jurors were not recorded. *See* Letter dated March 28, 2003 from Assistant District Attorney Christopher John Blira-Koessler, at 2. Accordingly, while it may be true that, as a technical matter, the record does not reflect the identified facts, that is because there is no such record.

In all other respects, the Court agrees with the Magistrate Judge's Report and Recommendation and, for the reasons stated therein, dismisses the petition. Clerk to enter judgment.

SO ORDERED.

## REPORT AND RECOMMENDATION

GORENSTEIN, United States Magistrate Judge.

Wayne Haywood, currently in the custody of Shawangunk Correctional Facility, petitions this Court for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254. Haywood was convicted in New York State Supreme Court, Bronx County, of Murder in the Second Degree and Conspiracy in the Second Degree (New York Penal Law §§ 125.25(1) and 105.15, respectively). For the following reasons, the petition should be denied.

## I. FACTUAL BACKGROUND

On January 6, 1994, Haywood was arrested in connection with the December 14, 1993 murder of Lillian DeJesus in the Bronx. (O'Toole: H. 59, 67–68; Marrero: H. 327, 335).[1]

### A. Pre–Trial Suppression Hearing

The trial court conducted a *Huntley* hearing, *see People v. Huntley*, 15 N.Y.2d 72, 255 N.Y.S.2d 838, 204 N.E.2d 179 (1965), that began on October 20, 1995 and continued through October 30, 1995. At the hearing, the court received testimony from Sergeant William O'Toole, Detective James Finnegan, Detective Joseph Miraglia, Detective James Smith, Detective Joseph Marrero, Detective David Negron and Detective Benny Tirado. Except where otherwise noted, the following facts—as testified to at the hearing by these investigating officers—are taken from the trial court's ruling on Haywood's

---

1. "H." refers to the transcript of the pre-trial suppression hearing; "V." refers to the transcript of the *voir dire;* "Tr." refers to the transcript of the trial; "S." refers to the transcript of the sentencing hearing.

motion to suppress the statements he made to the law enforcement officers.

Lillian DeJesus was shot and killed on December 14, 1993, at around 5:30 in the evening. *See* Decision and Order of Justice Ira. R. Globerman, dated November 13, 1996 ("Decision") (annexed to Affidavit in Opposition to Petition for Writ of Habeas Corpus, dated June 11, 2002 ("Aff. in Opposition"), Ex. 7), at 1. The subsequent investigation led to Jesus Ortiz, a young teenager who was picked up for questioning early in the morning of January 6, 1994. *Id.* at 2. During questioning by the police, Ortiz implicated himself, Jeffrey Rivera, Carlos Ocasio and Haywood in the murder. *Id.* Haywood was arrested at approximately 10:30 a.m. that morning and taken to the 48th Precinct. *Id.* Detective Smith advised Haywood of his *Miranda* rights, after which Haywood agreed to answer questions but denied any involvement in the shooting and, in fact, denied being present at the scene of the murder. *Id.* at 2–3. The interrogation ceased shortly thereafter. *Id.* at 3. Haywood, however, was kept at the precinct.

In the early afternoon of the same day, Rivera was arrested and identified Haywood as the person who shot DeJesus. *Id.* at 3. As a consequence of this identification, Sergeant O'Toole questioned Haywood around 2:30 p.m. but did not re-administer the *Miranda* warnings. *Id.* Haywood no longer denied being present at the scene of the crime and said, "I'll talk to you, but, I didn't kill anybody. I know I didn't pull the trigger." *Id.* at 4; *see also* O'Toole: H. 31–32. Later, around 9:45 in the evening of January 6, two lineups were held—one with Haywood and one with Rivera. Decision at 4. The eyewitness to the shooting, Maritza Osario, identified Rivera but not Haywood. *Id.; see also* Smith: H. 242; Memorandum of Law in Support of Petition for Writ of Habeas Corpus, filed February 5, 2002 ("Pet. Mem."), at 37. After the lineups, Haywood was returned to his cell as the detectives continued the investigation. Decision at 4.

Sergeant O'Toole and Detective Smith resumed questioning Haywood in the early morning of January 7, at which time Detective Smith re-administered the *Miranda* warnings. *Id.* at 4–5. Haywood again denied killing DeJesus. *Id.* at 5. Sergeant O'Toole then told him that "we have people who say you did," to which Haywood replied, "I'd like to talk to you, but I can't." *Id.* Sergeant O'Toole then asked him if he was afraid of Borys Diaz, another suspect the police had arrested. *Id.* Because Haywood "appeared surprised" at the mention of Diaz's name, the investigating officers told Haywood that Diaz was under arrest and showed Haywood that Diaz was in custody. *Id.; see also* Smith: H. 224. Haywood thereafter wrote out and signed two statements in which he admitted to being at the scene of the murder but again denied participation. Decision at 5–6. The second of the two statements was given at approximately 3:15 in the morning on January 7. (*See* Tr. 745). He also agreed to make a videotaped statement and in fact did so once the district attorney assigned to the case arrived at the precinct at 6:00 a.m. that morning. Decision at 6. Prior to making the videotaped statement Haywood was read the *Miranda* rights for a third time. *Id.* After Haywood made the final statement, he signed a "speedy arraignment" waiver and was kept at the precinct for an additional twelve hours—but apparently was not questioned further—before being taken to the Criminal Court building for arraignment. *See id.* at 7–8, 11 n. 2; *see also* Smith: H. 173–75, 261–62, 267–68; Stipulation: H. 363. The challenged written and videotaped statements were ultimately used by the prosecution at trial to

show that Haywood was present at the murder scene and that he went there with Diaz and Rivera. Tr. 738–39, 744–45, 747; *see also* Pet. Mem. at 38.

Following the hearing, the trial court found that the "videotaped statement demonstrate[d] that it was not procured through the use of any physical or emotional coercion." Decision at 6. Based on the "credible testimony" of the investigating officers, *id.* at 1, the court found the delay in arraignment to have been justified because the detectives "believed that other individuals involved in the crime might still be at large" and, given the "considerable publicity" surrounding the case, "the detectives feared that news of the arrests might prompt any unapprehended participants to flee." *Id.* at 7. The trial court also found that the delay was not "prolonged to prevent the entry of counsel into the case" but rather was necessary to conduct the "complex, rapidly unfolding" investigation, find "fillers" for the lineups, and locate the eyewitness and bring her to the precinct where the lineups were held. *Id.* at 8–11. Further, the investigation was complicated by the arrest of Diaz, who had been "at large" for twelve hours subsequent to Haywood's arrest. *Id.* at 10. As the officers believed there were other unknown people involved in the murder, the investigation was "continued and broadened." *Id.* And lastly, the three hour delay between the written and videotaped statements was deemed justified by the fact that the district attorney who was to conduct the interrogation did not arrive at the precinct until 6:00 a.m. on January 7. *Id.* at 10–11. In any event, the court found this delay did not postpone the appointment of counsel as arraignments are not held in Bronx County between 1:00 a.m. and 9:00 a.m. *Id.* The court noted that, during the twenty-hour period he had been interrogated, Haywood had been fed twice, allowed the opportunity to sleep, and permitted to use the telephone. *Id.* at 5. The court concluded that

> the 20 hour period between the time of the defendant's arrest and his final statement was not calculated to exhaust the defendant, overbear his will or circumvent his right to counsel. This time was taken to conduct an active, ongoing investigation into a highly publicized contract murder that involved many witnesses and suspects.

*Id.* at 11 (citation omitted).

The court was also satisfied that Haywood's waiver of his *Miranda* rights was knowing, intelligent and voluntary. *Id.* It was noted that Haywood had been arrested on three prior occasions and thus was not "unfamiliar" with the criminal investigation process. *Id.* As there was "absolutely no evidence to suggest that [Haywood's] will was overborne," the court found that the challenged statements were freely and voluntarily made after a knowing and intelligent waiver of *Miranda* rights. *Id.* at 12–13.

### B. *Evidence at Trial*

Haywood's trial began on September 26, 1996 before a jury in Bronx County. The evidence showed that on December 14, 1993, Lillian DeJesus was shot and killed as she and two others, Dilenia Abreu and Christopher Demma, were leaving work at Promesa, a Bronx-based substance abuse rehabilitation facility. (Abreu: Tr. 125–26; 142–49; Demma: Tr. 257–260). Abreu testified that she saw a young black male and a young Hispanic male, about age 16 or 17, standing across the street prior to the shooting; the black male gave a hand motion to the Hispanic male and they began moving away. (Abreu: Tr. 144–47, 166–68). Neither she nor Demma saw the person who shot DeJesus. (Abreu: Tr. 181–82; Demma: Tr. 260–61). Around

this time, Maritza Osario, a young woman who lived in the area, noticed two teenagers run "in a crouched position" between cars toward the parking lot. (Osario: Tr. 600–01). When they neared DeJesus one of them—who she described as a male Hispanic and later identified in a lineup as Jeffrey Rivera—fired one shot at close range, killing DeJesus. *Id.* at 609, 612, 635–36, 653. Promesa employee Elizabeth Jimenez testified that "one to five minutes" after DeJesus was shot, she saw two youths wearing hooded sweatshirts "hopping running" westbound. (Jimenez: Tr. 212–14, 235–36, 245–47).

The prosecution provided evidence that the murder had been arranged by Diaz, a co-worker of DeJesus. DeJesus was the Chief Financial Officer at Promesa and had discovered a $57,000 discrepancy in the books of the Third Party Reimbursement Unit—the unit responsible for distributing "walk around money" to the recovering addicts who were clients at Promesa. Diaz worked in that unit, where his duties included handling cash. (Abreu: Tr. 125–27, 133–35; Jimenez: Tr. 206–08; Knowles: Tr. 279–82, 286).

To support this theory, the prosecution introduced evidence that on November 18, 1993—one month before the murder— someone shot at and missed DeJesus as she was leaving work with two Promesa employees. (Abreu: Tr. 135–37, 139–42). Ortiz testified that after this first attempt Ocasio—Rivera's brother and a person with whom Ortiz had been friends for many years—told him that he (Ocasio) had shot at "some lady" at Promesa and that he had been "put [ ] up to it" by "some guy name Borys." (Ortiz: Tr. 457–58, 462–63, 496). Ortiz further testified that Ocasio told him that he (Ocasio) "was gonna go kill the lady from Promesa" because she owed Diaz $57,000 and that he was going to be paid $1,000 for the killing. *Id.* at

466. Ocasio offered Ortiz an undisclosed amount of money to serve as "look out" for the cops, *id.* at 467, 471, 540–41, 544, 549–50, an offer that Ortiz accepted without thinking. *See id.* at 467.

Ortiz further testified that at 4:00 in the afternoon on December 14, 1993, he, Rivera and Ocasio went "up the block" to meet with Diaz. *Id.* at 471–73. When they arrived at 138th Street and Cypress Avenue, Haywood was there by himself. *Id.* at 474. Haywood told them that he (Haywood) was going to "kill the lady," for which he was going to be paid five thousand dollars. *Id.* at 475–76. At this point, Diaz pulled up in a "black Pathfinder" jeep and called them over. *Id.* at 476. The four youths got into the jeep, with Ortiz, Ocasio and Rivera sitting in the back while Haywood sat next to Diaz in the front. *Id.* at 476–77. Diaz said "you got to kill the lady" and passed a black pistol to Haywood. *Id.* at 477. At this point, Ortiz said he was not going to go along and Diaz ordered him and Ocasio out of the jeep. *Id.* at 478, 550–51. Diaz then drove off with Rivera and Haywood. *Id.* at 479.

Ortiz testified that the jeep returned later that day and that Diaz was alone. *Id.* Later, Rivera and Haywood returned in a taxi, after which Rivera took out the gun and put it in the back of the jeep. *Id.* at 480–81. Ortiz saw Diaz give Haywood $100 and Rivera $50. *Id.* at 481. Ortiz testified that a day or two after the murder Haywood told him that he (Haywood) had shot DeJesus, *id.* at 482, 555—an admission contrary to Osario's eyewitness identification and Rivera's subsequent confession. On cross-examination, Ortiz admitted that he initially had lied to the police and district attorney about various matters, including a statement made when he was first arrested that he saw Haywood shoot DeJesus. *Id.* at 543, 553–55.

Haywood testified in his own defense. He testified that on the afternoon of December 14, 1993, he was standing in front of his home when Diaz and Rivera pulled up in Diaz's car. (Haywood: Tr. 842–43). Diaz asked Haywood if he wanted to go buy some marijuana. *Id.* at 843. After buying the marijuana, the three drove around smoking the marijuana and talking about girls. *Id.* at 848–49. At 179th Street and Boston Road, Diaz handed Rivera a gun. *Id.* At this point Haywood said he would have "nothing to do with the situation" and got out of the jeep and began walking away from the scene. *Id.* at 849. As he was walking away, he heard a shot and started running. *Id.* Although Haywood had previously told the police that he saw Rivera shoot DeJesus, he claimed the detectives coerced him into making the statement. *Id.* at 853–54, 1039–40, 1044, 1051–58.

Rivera was called to testify by the defense. When questioned, however, he asserted his Fifth Amendment privilege and refused to testify. (Rivera: Tr. 831–37).

## C. *Verdict and Sentence*

On October 11, 1996, the jury convicted Haywood of one count of Murder in the Second Degree, N.Y. Penal Law § 125.25(1), and one count of Conspiracy in the Second Degree, N.Y. Penal Law § 105.15. (Tr. 1334). On December 3, 1996, the court sentenced him to concurrent terms of 25 years to life for the murder conviction and 8–1/3 to 25 years for the conspiracy conviction. (S.21).

## D. *Appeal*

Haywood appealed his conviction to the Appellate Division, First Department raising the following claims: (1) the police intentionally and unnecessarily delayed his arraignment in order to question him without counsel present; (2) the trial court improperly ruled that Haywood's exercise of a peremptory challenge was unlawful under *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986); (3) Haywood was denied his right to be present during the *Batson* hearing and when his counsel exercised peremptory challenges; (4) the prosecution's introduction of hearsay statements at trial violated the hearsay rule and deprived Haywood of the right to confront and cross examine witnesses; (5) the trial court erroneously altered its *Sandoval* ruling in the middle of Haywood's testimony at trial; and (6) Haywood's sentence was excessive. *See generally* Brief for Defendant–Appellant, dated March 8, 2000 (reproduced in Aff. in Opposition, Ex. 1).

On February 6, 2001, the Appellate Division affirmed Haywood's conviction and sentence, addressing the merits of all the claims. *People v. Haywood*, 280 A.D.2d 282, 721 N.Y.S.2d 8 (1st Dep't 2001). As for the first claim, the Appellate Division found that the delay in arraignment was reasonable under the circumstances and did not render Haywood's statements involuntary or cause his right to counsel to attach:

> The approximately 20–hour delay between the time of defendant's arrest and his final statement was not extraordinary and was explained by the fact that the police needed to continue the investigation in an effort to unravel the conflicting accounts of what had transpired. Moreover, a considerable period of time was devoted to arranging and conducting lineups. The investigation concerning defendant's participation in the crime was intertwined with that involving the codefendants. The additional delay in arraignment that occurred after defendant made his last statement had no bearing on its voluntariness, and was reasonable in any event.

*Id.* at 282, 721 N.Y.S.2d 8 (citations omitted). In rejecting the claim that the trial court ruled incorrectly on the *Batson* challenge, the court noted that the trial court's finding of pretext was "supported by the record and is entitled to great deference on appeal because a trial court is in a unique position to determine the credibility of an attorney's assertion that a challenge is not race-based." *Id.* With respect to the presence-at-trial claim, the Appellate Division held that Haywood was not entitled to be present during the peremptory challenges and the *Batson* hearing because his attorney "was only performing the ministerial task of exercising the peremptory challenges to which defendant had agreed" and the proceedings did not involve "factual matters about which defendant might have peculiar knowledge." *Id.* at 282–83, 721 N.Y.S.2d 8 (quotation and citation omitted). As for the hearsay challenge, the court agreed with the trial judge and concluded that the evidence "was admissible under the coconspirators and the declarations against penal interest exceptions." *Id.* at 283, 721 N.Y.S.2d 8. As for the remaining two claims, the Appellate Division concluded that the trial court "properly modified" its *Sandoval* ruling as Haywood had "opened the door" on the issue and that there was "no basis" for reduction of the sentence imposed. *Id.*

By letter dated February 21, 2001, Haywood sought leave to appeal to the New York Court of Appeals. *See* Application for Leave to Appeal, dated February 21, 2001 ("Letter App.") (reproduced in Aff. in Opposition, Ex. 4). Haywood raised all of the issues raised in his appeal to the Appellate Division, except for the *Sandoval* and excessive sentence issues. *See id.* On October 2, 2001, the New York Court of Appeals denied Haywood's motion for leave to appeal. *People v. Haywood,* 97 N.Y.2d 641, 735 N.Y.S.2d 498, 761 N.E.2d 3 (2001).

### E. *The Habeas Petition*

On February 5, 2002, Haywood filed the instant petition for a writ of habeas corpus. *See* Petition for a Writ of Habeas Corpus by a Person in State Custody, dated January 29, 2002. In this petition he raises the same four claims raised in his letter application to the New York Court of Appeals.

## II. *DISCUSSION*

### A. *Applicable Law*

■ Habeas corpus relief is available if the petitioner is in custody in violation of the Constitution or laws or treaties of the United States, 28 U.S.C. § 2254(a), provided that the petitioner has exhausted the remedies available in the state courts or there is an absence of available state corrective process or circumstances exist rendering such process ineffective to protect the petitioner's rights. 28 U.S.C. § 2254(b). To satisfy the exhaustion requirement, a petitioner must present the substance of any federal constitutional claim raised in the federal petition to the highest court of the relevant state. *See, e.g., Aparicio v. Artuz,* 269 F.3d 78, 89–90 (2d Cir.2001). The respondent concedes that Haywood has presented the substance of his federal claims to the highest state court in New York. *See* Aff. in Opposition at ¶¶ 7–8.

■ Under 28 U.S.C. § 2254, as amended by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Pub.L. No. 104–132, 110 Stat. 1214, federal courts must defer to the state court determination of a habeas petitioner's federal claims on the merits. A state court ruling is "on the merits" even where the ruling does not discuss the federal claim or any federal law in its opinion adjudicating the state law conviction. *Sellan v. Kuhlman,* 261 F.3d 303, 312 (2d

Cir.2001); *see also id.* at 311 ("Nothing in the phrase 'adjudicated on the merits' requires the state court to have explained its reasoning process."). All that is required to trigger the statutory standard of review is the issuance of "a decision finally resolving the parties' claims, with res judicata effect, that is based on the substance of the claim advanced, rather than on a procedural, or other, ground." *Id.* at 311. The Appellate Division ruled on the merits of each claim Haywood raises in his habeas petition. *See Haywood,* 280 A.D.2d at 282–83, 721 N.Y.S.2d 8.

Where there has been a ruling on the merits, habeas relief may not be granted unless the state court decision 1) was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or 2) was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Moreover, a state court determination of a factual issue is "presumed" to be correct and that presumption may be rebutted only "by clear and convincing evidence." *Id.* at § 2254(e)(1).

■■■ A state court decision is contrary to clearly established federal law "if the state court applies a rule that contradicts the governing law set forth" in Supreme Court precedent or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives" at a different result. *Williams v. Taylor,* 529 U.S. 362, 405–06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). The "unreasonable application" clause is implicated if the state court "identifies the correct governing legal principle from [the Supreme Court's] decisions but unreasonably applies that principle to the facts of [a] prisoner's case." *Id.* at 413, 120 S.Ct. 1495.

The federal habeas court must decide "whether the state court's application of clearly established federal law was objectively unreasonable"—not whether the application was simply incorrect. *Id.* at 409–10, 120 S.Ct. 1495. Because "an *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law," *id.* at 412, 120 S.Ct. 1495 (emphasis in original), there must be "some additional increment of incorrectness such that it may be said to be unreasonable." *Lainfiesta v. Artuz,* 253 F.3d 151, 155 (2d Cir.2001) (citation omitted), *cert. denied,* 535 U.S. 1019, 122 S.Ct. 1611, 152 L.Ed.2d 625 (2002).

Each of Haywood's four claims is discussed separately.

### B. *Batson Claim*

#### 1. *The Trial Court's Batson Determination*

In *Batson v. Kentucky,* 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court set forth a "three-part test trial courts are to employ when evaluating whether a party exercised a peremptory challenge in a discriminatory manner." *Galarza v. Keane,* 252 F.3d 630, 635 (2d Cir.2001). As summarized in *Galarza,* the process consists of three steps:

[Step 1:] First, a trial court must decide whether the party challenging the strike has made a *prima facie* showing that the circumstances give rise to an inference that a member of the *venire* was struck because of his or her race. Such a *prima facie* case may be established, for example, by showing a pattern of strikes against minority prospective jurors....

[Step 2:] If the party making the *Batson* challenge establishes a *prima facie* case, the trial court must require the non-moving party to proffer a race-neu-

tral explanation for striking the potential juror. This second step does not require the party to give an explanation that is persuasive or even plausible.

[Step 3:] Finally, if the non-moving party proffers a race-neutral explanation, the trial court must determine whether the moving party has carried his or her burden of proving that the strike was motivated by purposeful discrimination.

*Id.* at 636 (citations omitted) (emphasis in original); *accord Miller–El v. Cockrell,* 537 U.S. 322, 338, 123 S.Ct. 1029, 1035, 154 L.Ed.2d 931 (2003).

The Second Circuit has noted that at the third stage of the *Batson* challenge:

a court must "make an ultimate determination on the issue of discriminatory intent based on all the facts and circumstances." *Galarza v. Keane,* 252 F.3d 630, 636 (2d Cir.2001) (quoting *Jordan v. Lefevre,* 206 F.3d 196, 200 (2d Cir.2000) (internal quotation marks omitted)). "We have repeatedly emphasized that a trial court may not deny a *Batson* motion without determining whether it credits the race-neutral explanations for the challenged peremptory strikes." *Galarza,* 252 F.3d at 636. "The credibility of an attorney offering a race-neutral explanation is at the very heart of [the *Batson* ] analysis." *Barnes[ v. Anderson],* 202 F.3d [150,] 157 [2d Cir. 1999].

*United States v. Thomas,* 303 F.3d 138, 144 (2d Cir.2002) (some brackets added).

In Haywood's case, after the first two rounds of voir dire examination, the prosecution objected that Haywood's counsel peremptorily challenged the only three white jurors of the 31 jurors available during the first two rounds of selection: Jurors Schnepf, Stevens and Zambardi.[2] (V.282–84). The trial court found that "a pattern of discriminatory striking has been demonstrated by the People" and then ordered defense counsel to explain why the three jurors had been challenged. *Id.* at 284. As for Juror Zambardi, defense counsel told the court that he was challenged because he "sat on the grand jury, he has close friends in the police department, he sat on a prior criminal case, went to verdict." *Id.* Defense counsel also told the court that "I conferred with my client as to Mr. Schnepf, and he didn't like his demeanor. It had nothing to do with his racial complexion, he was a veteran. That's all I can recall at this time as to the reasons that we exercised a preempt as to Mr. Schnepf." *Id.* at 285. The trial court then ruled

With respect to Mr. Schnepf, I will accept this once, the defendant's feeling that in looking at Mr. Schnepf or observing Mr. Schnepf, Mr. Schnepf made him uncomfortable. And I will accept that reason this once as a racially neutral explanation for a peremptory challenge. As the People pointed out Mr. Zambardi, a person who had been challenged, another person who also served on the grand jury. I will accept the explanation and find that it is racially neutral and non-pretextural [sic] for Mr. Zambardi.

(V.288–89).

Concerning Juror Stevens, defense counsel explained that "she also sat [as a juror] on a prior criminal case, she has a son who is an attorney involved with the courts, involved with law." *Id.* at 285. The prosecution countered that Stevens' background was no different from other

---

**2.** The fourth white juror among the 32 jurors in the first two rounds (Juror Cramer) had been excused for cause. (V.151–52, 286).

jurors who were not challenged. *Id.* at 286. For example, Juror Powell had ties to law enforcement inasmuch as her father, brother, an aunt and five uncles were all police officers and two of her cousins were attorneys. *Id.* at 234–35, 283. Juror Rodriguez had previously served on a jury, *id.* at 62, as did Juror Feliciano, *id.* at 266–67, while Juror Charlemagne had "several cousins" who were police officers in Puerto Rico and a cousin who was a "magistrate judge in [Bronx] Supreme Court." *Id.* at 90, 134–35. Juror Muniz was a student at John Jay College of Criminal Justice and read about criminal law. *Id.* at 92–94, 114.

When the prosecutor argued that Stevens' background was not different from other jurors, Haywood's counsel then gave two additional reasons for the strike: that Stevens' apartment was once burglarized while she was in it and, in another incident, her sister was raped and her car stolen. *Id.* at 286–88. To this the prosecution argued that "[s]ome of the other jurors had prior victims [sic]," specifically noting that one of the non-white jurors had also been the victim of a burglary. *Id.* at 288.

After hearing these arguments, the court ruled

> With regard to Ms. Stevens, I find that the reasons advanced are entirely pretext[ual]. The fact that Ms. Stevens has a son who just graduated from law school is not possibly and has not possibly been related to any issue in this case at all by the defense in explaining his challenge as to her. The crime for which she herself was a victim more than twenty years ago, she related to us at the sidebar, involved her finding a next door neighbor, a child, a young man in her house who was armed with a putty knife. She was armed with a Japanese sword, he fled, he was apprehended. She discussed that and told us

its only impact was a interesting story to relate by her. There could not possibly be any effect that that incident might have on her ability to serve as a fair and impartial juror here given the age and her attitude towards it. And her answers at the sidebar I can only find that the explanation offered in support of her peremptory challenge is pretext[ual] and she will be seated as a juror in this case.

(V.289–90). The court did not address the fact that Stevens' sister had been raped and had her car stolen.

■ Haywood only briefly argues that the trial court incorrectly concluded that the prosecutor made out a *prima facie* case under *Batson*—that is, that the prosecutor met "Step 1" of the three-part test by showing an inference of racial discrimination in the defendant's use of peremptory challenges. *See* Pet. Mem. at 20. To the extent this argument is being pursued before this Court, it could not be considered because it is nowhere mentioned in the petitioner's letter seeking leave to appeal to the New York Court of Appeals. *See* Letter App. at 7–11. By failing to raise the issue before the Court of Appeals, the petitioner cannot now raise it in this habeas proceeding. *See, e.g., Bossett v. Walker*, 41 F.3d 825, 829 (2d Cir.1994), *cert. denied*, 514 U.S. 1054, 115 S.Ct. 1436, 131 L.Ed.2d 316 (1995).

With respect to the second stage of the *Batson* analysis, no party contests that Haywood's counsel offered a race neutral explanation for his challenges. Thus, the sole issue relates to the trial court's ruling that the prosecution carried its burden of proving that the defendant's strike of Juror Stevens was "motivated by purposeful discrimination." *Galarza*, 252 F.3d at 636.

■ More specifically, the issue before this Court is Haywood's argument that the trial court erred in finding that defense

counsel's proffered reasons for striking Juror Stevens were a pretext for racial discrimination. Because there is no Supreme Court precedent with facts "materially indistinguishable" from this case, the question becomes whether the trial court's determination on this score represents an "unreasonable application" of clearly established federal law as determined by the Supreme Court of the United States, or whether the ruling was "based on an unreasonable determination of the facts." 28 U.S.C. § 2254(d); *see Overton v. Newton,* 295 F.3d 270, 277 (2d Cir.2002); *Lainfiesta,* 253 F.3d at 155. The Second Circuit has made clear that "[a] state court's determination whether [an attorney's] use of a peremptory challenge was motivated by discriminatory intent, in violation of *Batson,* is a factual determination and thus qualifies for th[e] presumption of correctness [under 28 U.S.C. § 2254(d) ]." *Bryant v. Speckard,* 131 F.3d 1076, 1077 (2d Cir.1997) (citing *Purkett v. Elem,* 514 U.S. 765, 769, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995)), *cert. denied,* 524 U.S. 907, 118 S.Ct. 2066, 141 L.Ed.2d 143 (1998); *accord Baker v. Bennett,* 235 F.Supp.2d 298, 311 (S.D.N.Y.2002). The presumption applies not merely to explicit determinations of fact but also to "implicit[ ]" findings. *See Channer v. Brooks,* 320 F.3d 188, 195 (2d Cir.2003); *see also id.* (deferential AEDPA review applies where trial court "effectively" made factual findings). Here, the trial court's finding that the "explanation offered in support of [the] peremptory challenge is pretext[ual]" (V.289) effectively represents a finding that the defense counsel's proffered reasons were not credible and that race was the true motivating factor. Because the trial court's factual determination that the defendant's strike was motivated by race is presumed correct under the AEDPA, Haywood has the "burden of rebutting [this] presumption ... by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Haywood's effort to show that the trial judge incorrectly concluded that the defense counsel's actual motive for striking Stevens was race is based in substantial part on his argument that the four reasons offered by defense counsel are both race-neutral and plausible reasons for a defense counsel to strike a juror. Pet. Mem. at 21–27. These reasons were: (1) that she had previously sat on a criminal case; (2) that her son was an attorney; (3) that she had been burglarized in her own home; and (4) that her sister was raped and her car stolen. (V.284–90). In response, the respondent rightly concedes that counsel's proferred reasons were "neutral and acceptable" ones for striking Stevens. Memorandum of Law, filed June 11, 2002 ("Resp.Mem.") (annexed to Aff. in Opposition), at 22. The issue before this Court, however, is not whether this Court considers the proferred reasons to be race-neutral and plausible. Instead, the issue is whether, "in light of the evidence presented in the State court proceeding," Haywood has shown by clear and convincing evidence that the trial court unreasonably determined that defense counsel's *real* reason for striking Stevens was her race. 28 U.S.C. §§ 2254(d)(2), 2254(e)(1).

To arrive at its determination of credibility, the trial court must necessarily have found that the four reasons counsel proferred were not the *real* reasons for the strike. This finding has some support in the record with respect to three of the reasons. The trial court observed that "[t]he fact that Ms. Stevens has a son who just graduated from law school is not possibly and has not possibly been related to any issue in this case at all." (V.289). As for the prior crime of which she had herself been a victim, the court found that it took place more than twenty years before

and, based on her attitude towards it and the manner with which she described it, that it "could not possibly" have impaired her "ability to serve as a fair and impartial juror." *Id.* While the judge did not specifically mention the issue of prior jury service, the prosecutor had already noted that certain other unstruck jurors had served on juries. *Id.* at 286; *see also id.* at 62, 266–67. Thus, the defendant certainly has not met his burden to show the trial court's finding was incorrect with respect to three of the four reasons given by defense counsel.

The trial court, however, did not give any explanation for his rejection of the fourth proferred reason—that is, that Juror Stevens had a sister who had been the victim of a rape and car theft—nor does the record appear to provide such an explanation. The court simply omitted this reason when it explained why it found defense counsel's reasons pretextual. By itself, this particular reason is on its face a highly plausible and compelling reason for a defense counsel to strike a juror. The record does not reflect that any of the other unstruck venirepersons up to that point had been the victim of a violent crime or had a close relative who had been the victim of a violent crime. Haywood makes a compelling argument that the trial judge's rejection of this particular reason is without any support at all. In the context of this federal habeas review, the question becomes whether the absence of an explanation (or other evidence) with respect to this reason is sufficient for Haywood to meet his burden of overcoming the presumption that the trial court correctly found that defense counsel lied in proffering his reasons for the strike.

Had the rape of Juror Stevens' sister been the sole reason proffered by defense counsel, and had the trial court completely failed to address it in its ruling (and the record failed to support the ruling), this Court might well conclude that Haywood had met his burden of showing that the trial court's credibility determination was an unreasonable one. After all, it makes perfect sense for a defense attorney to strike a potential juror whose sister had been the victim of a violent crime—particularly where the attorney's client is himself charged with a violent crime. If this reason is teased out and considered separately from all others, then the record contains nothing to support the judge's credibility determination.

It would be improper, however, for this Court to consider this reason in isolation. Looking at the record as a whole, some support can be mustered to support the trial court's ruling on defense counsel's credibility. First, the most justifiable reason for exercising the challenge here—the rape of the juror's sister—was not stated by defense counsel initially. Defense counsel at first stated that the reasons for his strike were that Stevens had sat on a prior criminal case and had a son who was an attorney. (V.285). The prosecutor then pointed out that other unstruck jurors had prior criminal experience and that Stevens' son was a corporate attorney. *Id.* at 286–87. It was only after this colloquy that defense counsel added as reasons that Stevens' apartment had been burglarized (while she was home) and that her sister had been raped. *Id.* at 287–88. The delay in providing this reason would support the trial court's conclusion that it did not represent the actual reason in defense counsel's mind when he exercised the challenge.

Second, defense counsel offered three reasons for which the record does support a finding of pretext because the reasons given by defense counsel were shared by unstruck jurors. Courts have routinely held that when characteristics are shared

by excused members of the venire and those ultimately chosen to serve—and the only difference between them is race—the trial judge may rightly consider that fact as evidence of a pretext. *See, e.g., United States v. Alvarado,* 923 F.2d 253, 256 (2d Cir.1991) ("The relative plausibility or implausibility of each explanation for a particular challenge, assessed in light of the prosecution's acceptance of jurors with similar circumstances, may strengthen or weaken the assessment of the prosecution's explanation as to other challenges and thereby assist the fact-finder in determining overall intent."); *Roman v. Abrams,* 822 F.2d 214, 228 (2d Cir.1987) (inconsistent application of race-neutral explanations may suggest pretext), *cert. denied,* 489 U.S. 1052, 109 S.Ct. 1311, 103 L.Ed.2d 580 (1989); *Walters v. Mitchell,* 2002 WL 1751400, at *4 (E.D.N.Y. July 18, 2002) (same). Given that the trial court had good reasons for finding defense counsel was untruthful with some of the reasons he gave, the trial court could properly conclude that these false reasons cast doubt on the credibility of his proffer of what otherwise might have been a valid reason.

The Supreme Court has noted that the trial court is in the best position to observe the demeanor and assess the credibility of the attorney exercising the peremptory challenge. *Miller–El,* 537 U.S. at 322–326, 123 S.Ct. at 1040–41; *Hernandez v. New York,* 500 U.S. 352, 365, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). As previously discussed, the record here provides some support for the trial court's credibility determination. A federal habeas court must examine the trial court's factual finding on this score "in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Examining the record as a whole, Haywood has not rebutted the presumption of correctness accorded the trial court's finding of pretext by clear and convincing evidence.

**2. *Effect of an Incorrect* Batson *Ruling***

█ In any event, assuming *arguendo* that the trial judge had erroneously denied Haywood the right to use his peremptory challenge on Juror Stevens, such a denial would still not warrant federal habeas relief. *Batson* is founded on the concept that discrimination in jury selection is an independent wrong that must have redress. Thus, the Supreme Court has explained:

> Discrimination in jury selection, whether based on race or on gender, causes harm to the litigants, the community, and the individual jurors who are wrongfully excluded from participation in the judicial process. The litigants are harmed by the risk that the prejudice that motivated the discriminatory selection of the jury will infect the entire proceedings. The community is harmed by the State's participation in the perpetuation of invidious group stereotypes and the inevitable loss of confidence in our judicial system that state-sanctioned discrimination in the courtroom engenders.

*J.E.B. v. Alabama ex rel. T.B.,* 511 U.S. 127, 140, 114 S.Ct. 1419, 128 L.Ed.2d 89 (1994) (internal citation omitted). Other cases have made plain that there is a similar harm that results from a defendant's use of a discriminatory challenge. *Georgia v. McCollum,* 505 U.S. 42, 49, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992) ("Regardless of who invokes the discriminatory challenge, there can be no doubt that the harm is the same—in all cases, the juror is subjected to open and public racial discrimination.").

Where a party is *disallowed* a peremptory challenge, by contrast, none of the harms implicated by *Batson* are at issue because no discrimination has occurred.

This is true even if the disallowance was based on an incorrect assessment of counsel's motive for exercising the peremptory challenge. The only harm is that the litigant has been mistakenly deprived of a peremptory challenge. Accordingly, the question becomes whether an incorrect disallowance of a peremptory challenge to a criminal defendant—for *any* reason, not just an incorrect application of *Batson*—results in a violation of federal constitutional or statutory law. *See* 28 U.S.C. § 2254(a). The particular reason for the disallowance is analytically irrelevant.

█ On this point, federal law has made clear that "peremptory challenges are not of constitutional dimension" but rather are simply the "means to achieve the end of an impartial jury." *Ross v. Oklahoma*, 487 U.S. 81, 88, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988); *accord United States v. Martinez–Salazar*, 528 U.S. 304, 311, 316, 120 S.Ct. 774, 145 L.Ed.2d 792 (2000); *see also Stilson v. United States*, 250 U.S. 583, 586, 40 S.Ct. 28, 63 L.Ed. 1154 (1919) ("There is nothing in the Constitution of the United States which requires the Congress to grant peremptory challenges to defendants in criminal cases; trial by an impartial jury is all that is secured."). While the right to peremptories has been called "'one of the most important of the rights secured to the accused,'" *Ross*, 487 U.S. at 89, 108 S.Ct. 2273 (quoting *Swain v. Alabama*, 380 U.S. 202, 219, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965)), it remains a "creature of statute and [is] not required by the Constitution." *Id.* (citation omitted). In *Ross*, the trial court incorrectly failed to excuse a juror for cause, thus requiring the defendant to use one of his nine peremptory challenges to excuse that juror. *Id.* at 83–84, 88, 108 S.Ct. 2273. The net result was that the defendant was unjustifiably deprived the use of a peremptory challenge. *Ross* held

that this denial by the trial court did not amount to a federal constitutional violation because "the loss of a peremptory challenge [does not] constitute[ ] a violation of the constitutional right to an impartial jury." *Id.* at 88, 108 S.Ct. 2273. The same principle applies here.

Haywood's argument, however, appears to rest not on a claimed denial of his right to an impartial jury but rather on the notion that his right to due process was denied by the erroneous denial of the peremptory challenge. As to this argument, *Watson v. Camp*, 848 F.2d 89 (7th Cir.), *cert. denied*, 488 U.S. 863, 109 S.Ct. 164, 102 L.Ed.2d 134 (1988), is instructive. In *Watson*, the trial court deprived both the defendant and prosecutor of a peremptory challenge in violation of Illinois law. *Id.* at 90, 92. In denying the subsequent petition for writ of habeas corpus, the Seventh Circuit recognized the importance of affording peremptory challenges but noted that an "'important' right is not necessarily a constitutional guarantee" and that habeas relief would be appropriate "only if the *Constitution* required the state to afford [the petitioner] an additional peremptory challenge." *Id.* at 91 (emphasis in original). The *Watson* court concluded that the erroneous denial of one peremptory challenge "simply does not violate the Constitution by casting doubt on the impartiality of an otherwise validly constructed jury." *Id.* at 92. The reasoning of *Watson* was followed in *Irwin v. Singletary*, 882 F.Supp. 1036 (M.D.Fla.1995), which likewise held that the erroneous denial of a peremptory challenge to a defendant "simply does not rise to Constitutional proportions." *Id.* at 1040; *accord Black v. Herbert*, 2002 WL 1880711, at *4 (S.D.N.Y. Aug. 14, 2002) (because peremptory challenges are "state created means to the constitutional end of an impartial jury and fair trial ... the right to a peremptory challenge may be withheld alto-

gether without impairing the constitutional guarantee of an impartial jury and a fair trial") (citing *Georgia v. McCollum*, 505 U.S. 42, 57, 112 S.Ct. 2348, 120 L.Ed.2d 33 (1992)).

Haywood seems to argue that the violation here was not one of state law but the result of an erroneous application of *federal* law—specifically of *Batson*. It should not matter, however, how it came about that the defendant was erroneously denied a peremptory challenge. In an analogous context, the Seventh Circuit in *Bell v. Duckworth*, 861 F.2d 169 (7th Cir.1988), *cert. denied*, 489 U.S. 1088, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989), noted that

> procedural errors committed in the course of a state criminal trial are not a ground for federal habeas corpus. Only *constitutional* error is a ground. This fundamental limitation on the habeas corpus jurisdiction may not be got round by the facile equation of state procedural error to due process denial … [T]he due process clause does not incorporate every refinement of legal procedure designed to make trials fairer or more accurate—not even one hallowed by time [such as peremptory challenges, citing *Watson* ]. It forbids only egregious departures from accepted standards of legal justice.

*Id.* at 170 (some citations omitted) (emphasis in original). Here, the trial court's application of the *Batson* standard—assuming it to be incorrect—was analogous to a state procedural error because it had the effect not of denying a federal right but rather of denying a *state*-created right to a peremptory challenge. While we have assumed for purposes of this section that the trial court's *Batson* ruling resulted in a decision based "on an unreasonable determination of the facts" under 28 U.S.C. § 2254(d)(2), that does not mean a due process violation occurred. No due pro-

cess violation resulted because the trial court's ruling—even if incorrect—did not constitute an "egregious departure[ ] from accepted standards of legal justice," *Bell*, 861 F.2d at 170,

One such "egregious departure" occurred in a case to which Haywood cites, *United States v. Harbin*, 250 F.3d 532 (7th Cir.2001), where the prosecution—and not the defense—was unjustifiably permitted to use a peremptory challenge mid-trial. *Harbin* thus held that due process was violated because the balance needed for a fair trial was "skewed" by the government's attempt to "unilaterally alter the composition of the jury mid-trial." *Id.* at 540–42.

In sum, even if the trial court incorrectly denied Haywood a peremptory challenge, that denial did not violate the federal Constitution. Accordingly, the petition for habeas relief on this ground must be denied.

## C. Presence at Trial Claim

Haywood's second ground for setting aside his conviction concerns the claim that because he was not present during the *Batson* hearing or during his counsel's exercise of peremptory challenges, he was denied his right under the Sixth and Fourteenth Amendments to be present at all critical stages of trial.

 Every criminal defendant has a "fundamental right[ ]" to be present at all "critical stages" of his or her trial. *Rushen v. Spain*, 464 U.S. 114, 117, 104 S.Ct. 453, 78 L.Ed.2d 267 (1983). The length of the absence and specific nature of the proceedings are factors to consider in determining whether the stage was "critical." *See Sutherland v. Walker*, 1999 WL 1140870, at *12 (S.D.N.Y. Dec. 10, 1999); *United States v. Alfano*, 664 F.Supp. 160, 161–62 (S.D.N.Y.1987). This right is rooted in the Confrontation Clause

of the Sixth Amendment and due process guarantees. *United States v. Canady*, 126 F.3d 352, 360 (2d Cir.1997), *cert. denied*, 522 U.S. 1134, 118 S.Ct. 1092, 140 L.Ed.2d 148 (1998). However, the right is not absolute but rather is implicated only where the defendant's presence "has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge." *Snyder v. Massachusetts*, 291 U.S. 97, 105–06, 54 S.Ct. 330, 78 L.Ed. 674 (1934); *accord Clark v. Stinson*, 214 F.3d 315, 322–23 (2d Cir.2000), *cert. denied*, 531 U.S. 1116, 121 S.Ct. 865, 148 L.Ed.2d 778 (2001). It applies where fairness and justice "would be thwarted by [the defendant's] absence, and to that extent only." *Stinson*, 214 F.3d at 323 (quoting *Snyder*, 291 U.S. at 107–08, 54 S.Ct. 330). Accordingly, there is no constitutional right to be present "when presence would be useless, or the benefit but a shadow." *Snyder*, 291 U.S. at 106–07, 54 S.Ct. 330. In addition, this right is circumscribed by harmless error analysis. *Rushen*, 464 U.S. at 117 n. 2, 119–20, 104 S.Ct. 453.

At a pre-trial conference held on September 12, 1996, before jury selection began, Haywood waived his right to be present at sidebar conferences with jurors. (V.16–18). Once jury selection began, however, Haywood was absent not only from sidebar conferences with potential jurors but also from (1) robing room conferences, without jurors present, where the attorneys exercised their peremptory strikes and (2) from the *Batson* hearing, also held in the robing room. Pet. Mem. at 10; *see also* V. 150–57, 162–71, 276–90, 319–22, 441–52. Each is discussed separately.

 a. *Peremptory Challenges.* Haywood argues that his constitutional rights were violated because he was not present when his attorney actually announced his peremptory challenges. Pet. Mem. at 33–35. While Haywood acknowledges that his counsel left the robing room on several occasions in order to confer with him about the challenges, *id.* at 28–29, 33–34; *see also* V. 154, 156–57, 278, 445, he argues that these conferences were no substitute for actual presence while the challenges were made. Pet. Mem. at 34.

As an initial matter, the record does not support Haywood's claim that he "was not asked to waive his right to presence during the exercise of the peremptory challenges and he did not waive the right." *Id.* Prior to the first round of challenges the trial judge noted, "I told you [addressing Haywood's counsel] that your client could be present for the exercising of the challenges in the robing room. And your client . . . has declined to be present; is that correct?," to which counsel replied, "I am going out to confer with him after [the prosecutor] makes his selection." (V.150–51). Thereafter, once the State made its challenges, defense counsel conferred with Haywood. *Id.* at 154, 156–57, 278, 445. Thus, although the specific exchange to which the trial judge referred in addressing defense counsel appears to have been off the record, the transcript suggests that Haywood in fact waived his right to be present.

In any event, Haywood's argument fails under the Second Circuit's decision in *Cohen v. Senkowski*, 290 F.3d 485 (2d Cir. 2002), *cert. denied*, 537 U.S. 1117, 123 S.Ct. 879, 154 L.Ed.2d 794 (2003). In *Cohen*, the petitioner sought habeas relief on the ground, among others, that his absence from the in-chambers exercise of peremptory challenges violated his constitutional rights. *Id.* at 488. In rejecting this claim, the court first noted that petitioner had been "represented by counsel at these sessions, that he was given an opportunity to consult with counsel before the sessions began, and that the challenges were later

effectuated in open court." *Id.* at 490. The court went on to agree with "[m]any . . . sister circuits" that have held that "if a defendant is given an opportunity to register his opinions with counsel after juror questioning and is present when the exercise of strikes is given formal effect, then his constitutional right to be present is satisfied." *Id.* (citing cases). As the petitioner's rights "were sufficiently preserved by his presence during the questioning of jurors, his opportunities to confer with counsel, and the formal announcement of the stricken and seated jurors in open court," the habeas claim was denied.

*Cohen* is factually indistinguishable on this point from the instant case. Here, petitioner was represented by counsel when the peremptory challenges were made, he was afforded multiple opportunities to confer with counsel prior to and during the exercise of challenges (*see* V. 154, 156–57, 278, 445), and he was present when the formal announcement of the stricken and seated jurors was made in open court. *See id.* at 157–59, 290–91, 452. Accordingly, "his absence from the robing room during the formal exercise of challenges did not affect his ability to participate meaningfully in jury selection or otherwise frustrate the fairness of the proceedings against him." *Cohen,* 290 F.3d at 490 (quoting *Evans v. Artuz,* 68 F.Supp.2d 188, 195 (E.D.N.Y.1999)) (bracketing omitted).

■ *b. Batson Hearing.* Haywood also argues that his constitutional rights were violated when he was deprived of his right to be present at the *Batson* hearing that took place in the trial judge's robing room. Pet. Mem. at 28–33. He urges that this hearing was material in that, once the State challenged defense counsel's exercise of the peremptories, it was necessary for him and counsel to engage in a "fuller discussion" concerning the reasons for

striking the juror so that they could defend against the *Batson* claim. *Id.* at 30–32. By "reconstructing and articulating the reasons for [the] jury strikes," Haywood claims that he could have explained how and why the challenges were made. *Id.* at 30–31.

This very issue was considered in *Sutherland,* in which the petitioner argued that if he had been present at his *Batson* hearing he "could have reminded his attorney of the non-racially motivated reasons behind their exclusion of certain jurors, which could have resulted in their exclusion from the final panel." 1999 WL 1140870, at *11. In rejecting this argument, however, the court noted that it was "unlikely that [petitioner's] presence would have contributed to the hearing's fairness" since the *Batson* hearing did not depend on the opportunity to "offer every possible explanation for [the] challenges, but rather upon the legitimacy of the judge's determination as to the attorney's credibility." *Id.* at *12. Because *Sutherland* found the presence of petitioner would not likely have altered the trial judge's assessment of the bona fides of the challenge itself, the *Snyder* standard of a "reasonably substantial opportunity" to defend oneself was not implicated. *Id.; see also People v. Williams,* 199 A.D.2d 445, 446, 605 N.Y.S.2d 383 (2d Dep't 1993) (rejecting claim that defendant was denied a fair trial because of his exclusion during sidebar at which race neutral reasons for *Batson* challenge were given since "defendant's right to be present does not extend . . . to every discussion between counsel and the court simply because it takes place during and pertains to the impaneling of the jury and the exercise of challenges") (quoting *People v. Ramos,* 173 A.D.2d 748, 749, 570 N.Y.S.2d 247 (2d Dep't 1991)).

This Court agrees with the reasoning of *Sutherland.* The *Batson* hearing in this

case did not constitute a "critical" stage requiring Haywood's presence. First, the hearing was relatively brief, having been recorded in eight pages of transcript. (V.282–290). More importantly, counsel met with petitioner immediately before the hearing and conceded to having "ample opportunity" to discuss the reasons for the challenge with him at that time. *Id.* at 278. Finally, even if it were accepted that Haywood may have been able to explain more fully his justification for the strike had he been present, this would have been irrelevant to the critical issue at the *Batson* hearing: the credibility of the reasons given by his *attorney.* Because Haywood's presence would not have had a "reasonably substantial" relation to his opportunity to defend against the charges, *Snyder,* 291 U.S. at 105–06, 54 S.Ct. 330, his absence from the *Batson* hearing did not violate the federal Constitution.

### D. *Delay in Arraignment Claim*

■ Haywood argues that his constitutional rights were violated because the police intentionally and unnecessarily delayed his arraignment so that he could be questioned and give statements without the assistance of counsel. Pet. Mem. at 36–43; Reply Memorandum of Law in Support of Petition for Writ of Habeas Corpus, filed July 11, 2002 ("Pet. Reply Mem."), at 13–15. Haywood was in custody for approximately thirty-two hours before being arraigned. *See* Decision at 11 n. 2. He made his last statement to the police twenty hours after his arrest and was not questioned further. *See id.* at 8, 11 n. 2; Haywood: Tr. 1058. Haywood contends that the incriminating statements would not have been obtained had the police "timely taken" him for arraignment. *See* Pet. Mem. at 38–39.

Haywood does not articulate what "clearly established" law of the Supreme

Court was unreasonably applied by the Appellate Division in rejecting this ground. While he asserts in the point heading of his brief that the delay violated his "Fifth, Sixth and Fourteenth" Amendment rights, *id.* at 36, he makes no clear constitutionally-based argument on this score. The brief cites to *County of Riverside v. McLaughlin,* 500 U.S. 44, 111 S.Ct. 1661, 114 L.Ed.2d 49 (1991), but this case held only that under the Fourth Amendment an arrestee must receive a prompt probable cause determination and that "judicial determinations of probable cause within 48 hours of arrest will, as a general matter, comply with the promptness requirement. . . ." *Id.* at 56, 111 S.Ct. 1661. Nothing in the record reflects that Haywood's arraignment took place more than 48 hours after his arrest. Haywood notes that *County of Riverside* also proscribes "delays for the purpose of gathering additional evidence to justify the arrest." *Id.* at 56, 111 S.Ct. 1661. But there is no suggestion here that the police lacked probable cause to arrest Haywood and that he was held merely so that the questioning could provide that probable cause. The trial court found the length of detention necessary for several reasons, including the publicity surrounding the case and the concern that "news of the arrests might prompt any unapprehended participants in the crime to flee." Decision at 7. The Appellate Division also noted that the delay was "needed to continue the investigation in an effort to unravel the conflicting accounts of what had transpired" and that the "investigation concerning [Haywood's] participation in the crime was intertwined with that involving the codefendants." 280 A.D.2d at 282, 721 N.Y.S.2d 8. Further, "a considerable period of time was devoted to arranging and conducting lineups." *Id.* All of these factual findings are presumed correct and have not been rebutted by clear and convincing evidence.

28 U.S.C. § 2254(e)(1). Thus, there is no basis for concluding that the police acted improperly in bringing Haywood for arraignment at the time they did.

Haywood cites to the fact that, in explaining what the "speedy arraignment" waiver was and why he should sign it, Detective Smith told Haywood "[y]ou have the right to see the judge, you know, within a certain time period. And after you have seen the judge, I will not be able to speak to [you] no further." (Smith: Tr. 174; *see also id.* at 175 ("I told him that once he was arraigned, I won't be able to speak to him no further. The investigation was still pending, and one of the defendants, Borys, was working with us and we advised him for his safety, it would be better if he stayed with us instead of being arraigned"); *id.* at 260 ("we informed him if he was to be arraigned, he won't be able to help us further in an investigation")). But these statements by the officer are irrelevant to Haywood's claim inasmuch as they were not made until *after* Haywood had given his final statement.

In *Holmes v. Scully,* 706 F.Supp. 195 (E.D.N.Y.1989), the court noted that

> to the extent that federal habeas courts have even considered the constitutionality of delaying arraignment of state defendants, they have only done so as part of a Fifth Amendment based analysis of the voluntariness of confessions. Thus, delay in arraigning a state defendant is not, in itself, a constitutional violation, but is at most a factor to be weighed in determining whether or not, viewed in the totality of the circumstances, an incriminating statement was the product of police coercion.

*Id.* at 202 (citing cases); *accord Sklar v. Ryan,* 752 F.Supp. 1252, 1264 (E.D.Pa. 1990) ("An undue delay between arrest and arraignment only gives rise to a constitutional claim when the delay results in a confession that was coerced.") (citations omitted), *aff'd,* 937 F.2d 599 (3d Cir.1991). Haywood does not challenge the trial court's ruling that his statement was voluntary, and, in any event, such an argument would be barred from review as he did not raise it in the direct appeal of his criminal conviction.

Because the delay in bringing Haywood to court for arraignment was justified based on the circumstances of the ongoing investigation, this ground for relief must be rejected.

### E. *Use of Hearsay Statements Claim*

Finally, Haywood argues that the State used hearsay and double hearsay statements at trial, the introduction of which denied him the constitutional right to confront and cross-examine witnesses. Pet. Mem. at 44–52; Pet. Reply Mem. at 16–17. Specifically, Haywood objects to the following portions of Jesus Ortiz's testimony:

> [Prosecutor]: Jesus, I am going to direct your attention now to November 1993, sometime around Thanksgiving or prior to Thanksgiving of 1993. Did you have a conversation with Carlos Ocasio Jr. or Carlito?
>
> [Ortiz]: Yes, I did.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> [Prosecutor]: What if anything did he say to you, at that time?
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> [Ortiz]: He was talking to me about some lady that he shot at at Promesa and that he missed and he had hit somebody else.
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> [Prosecutor]: Did he say anything else to you?
>
> [Ortiz]: No, he didn't.

[Prosecutor]:.... Did he say who put him up to it if anybody?

[Ortiz]: Yeah. He told me some guy name Borys.

[Prosecutor]: And did he tell you where Borys was from?

[Ortiz]: No, he didn't.

[Prosecutor]: Did he say whether he did it alone?

[Ortiz]: He told me he went with some other guy.

[Prosecutor]: What was the other guy's name?

[Ortiz]: Peto.

(Ortiz: Tr. 461–63) ("First Statement"). Defense counsel had objected to this testimony on hearsay grounds. (Tr. 413). With respect to this testimony, the trial judge ruled

The objection to the admissibility of that conversation is overruled. I find that it does satisfy the grounds in the [*People v. Settles*, 46 N.Y.2d 154, 412 N.Y.S.2d 874, 385 N.E.2d 612 (1978)] criteria, that the defendant is unavailable, that the reliability of the declarant is established because it is a firsthand statement. The reliability of the statements established by the subsequent events as outlined by [the prosecutor]. I don't believe the evidence establishes that there were two conspiracies here. There was one conspiracy that had as its objective the death of Lillian DeJesus. The fact that the defendant joined that conspiracy while it was ongoing did not sever[ ] the conspiracy in two. The objectives, the main participants in the conspiracy remained the same throughout. It is a unitary conspiracy. The relevance of the prior statement is to, at the very least, establish the existence of the conspiracy. It establishes Borys Diaz's role in the conspiracy. It establishes Carlos Ocasio's connection and [bona fides] as the person who could recruit the witness to be a participant. It explains the objective conspiracy and makes meaningful the subsequent conversation two days before the murder in which the witness was recruited by Carlos to be a participant. I also find that the statements of Carlos are part of the res gestae of the conspiracy. They are evidence of the existence of the conspiracy.

(Tr. 418–19).

Next, Haywood objects to the admission of this portion of Ortiz's testimony, concerning a conversation that took place in December 1993:

[Prosecutor]: And could you tell us if you had another conversation with Carlito about Promesa?

[Ortiz]: Yes.

[Prosecutor]: Go ahead.

[Ortiz]: He was telling me that they was gonna go kill the lady from Promesa.

[Prosecutor]: And did he say who wanted it done?

[Ortiz]: Yeah. He said the guy name Borys wanted him to go kill her.

[Prosecutor]: And you talk about any money?

[Ortiz]: Yes. He said he was going to get paid a thousand dollars.

[Prosecutor]: Did he say anything about why Borys wanted her killed?

\* \* \* \* \* \*

[Ortiz]: He said that Borys—the lady owe Borys some money.

[Prosecutor]: You know how much?

[Ortiz]: Carlito told me it was fifty seven thousand.

[Prosecutor]: Fifty seven thousand dollars?

[Ortiz]: Yes.

[Prosecutor]: And did Carlito want you to do something?

[Ortiz]: Yes. He had asked me if I wanted to look out.

[Prosecutor]: To be what?

[Ortiz]: If I wanted to be a watch out.

[Prosecutor]: A watch out for what?

[Ortiz]: For the cops.

\*　　\*　　\*　　\*　　\*　　\*

[Prosecutor]: ... [D]id Carlos promise you any money for this?

[Ortiz]: He offered me money, but he didn't told me how much.

(Ortiz: Tr. 465–67, 71) ("Second Statement"). Haywood argued before the trial court—as he argues here—that the above statement was mere "bragging" and was not in furtherance of the conspiracy. (Tr. 420–21). The trial court disagreed, finding as follows:

> With regard to the double hearsay it is not the People's [co]ntention that Lillian DeJesus owed fifty seven thousand dollars to Borys Diaz. That statement is not offered for its truth. In fact the People contend it is quite the opposite, that statement was false. I don't believe there are any double hearsay issues even if that were a ground to object to it. This statement appears to me to be directly in furtherance of the conspiracy an attempt to recruit [Ortiz] and explain to [Ortiz] why the conspiracy was being carried out. And it is reliable for the same reasons as I just gave. The declarant is a participant, it is against the declarant's penal interest. The declarant has a motive to falsify. In fact, the declarant was attempting to elicit [Ortiz] to participate in a murder conspiracy.

(Tr. 421–22).

Finally, Haywood objects to the introduction of this testimony:

> [Prosecutor]: Now, I direct your attention to the time of December 14th, 1993 around noon time during the day. Do you remember where you were?

[Ortiz]: Yes, we was at his house.

[Prosecutor]: Did there come a time Carlos went somewhere?

[Ortiz]: Yes.

[Prosecutor]: Where did he go?

[Ortiz]: Me and him, we went—we went down the block.

[Prosecutor]: And what did he do when you got down the block?

[Ortiz]: He made a phone call.

[Prosecutor]: Did he call somebody?

[Ortiz]: Yes.

[Prosecutor]: And after he got done with the call did you have a conversation with him?

[Ortiz]: Yes. He told me—he told me that [Borys] said we got to meet him up the block.

(Ortiz: Tr. 471–72) ("Third Statement"). The trial court also allowed this testimony, concluding that "it is clearly all part of the conspiracy. They are all acts to carry out the killing. It appears to me there is literally a conspiracy unfolding. It is a res gestae of a conspiracy." (Tr. 424).

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. amend. VI. However, because rules against hearsay and the Confrontation Clause itself are "generally designed to protect similar values," *California v. Green*, 399 U.S. 149, 155, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), a statement that is admissible under a "firmly rooted" exception to the hearsay rule normally does not run afoul of the Confrontation Clause. *See, e.g., White v. Illinois*, 502 U.S. 346, 356, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) ("[W]here proffered hearsay has sufficient guarantees of reliability to come within a firmly rooted exception to the hearsay

rule, the Confrontation Clause is satisfied."); *Mitchell v. Hoke,* 930 F.2d 1, 2 (2d Cir.1991) ("[I]f evidence is admissible pursuant to 'a firmly rooted hearsay exception,' it generally does not offend the confrontation clause.") (citations omitted). Included in the list of "firmly rooted" exceptions are statements by coconspirators. *See Bourjaily v. United States,* 483 U.S. 171, 183, 107 S.Ct. 2775, 97 L.Ed.2d 144 (1987).

Under federal evidentiary rules, "[a] statement is not hearsay if [t]he statement is offered against a party and is ... a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." Fed.R.Evid. 801(d); *see, e.g., Bourjaily,* 483 U.S. at 175, 107 S.Ct. 2775; *Glenn v. Bartlett,* 98 F.3d 721, 727–28 (2d Cir.1996), *cert. denied,* 520 U.S. 1108, 117 S.Ct. 1116, 137 L.Ed.2d 317 (1997). Similarly, "it has long been settled [under New York law] that the declarations of one coconspirator made in the course and furtherance of a conspiracy are admissible against all other coconspirators as an exception to the general rule against hearsay." *People v. Sanders,* 56 N.Y.2d 51, 62, 451 N.Y.S.2d 30, 436 N.E.2d 480 (1982); *accord People v. Bac Tran,* 80 N.Y.2d 170, 179, 589 N.Y.S.2d 845, 603 N.E.2d 950 (1992). The New York rule differs from its federal counterpart inasmuch as the proponent of the statement in state court must demonstrate reliability in addition to the other foundational requirements. *Sanders,* 56 N.Y.2d at 63–65, 451 N.Y.S.2d 30, 436 N.E.2d 480; *see also People v. Persico,* 157 A.D.2d 339, 345–49, 556 N.Y.S.2d 262 (1st Dep't 1990). For purposes of federal habeas review, however, the only issue is whether the complained-of statements were admissible under the corresponding federal rule governing the admission of coconspirator statements. The Second Circuit has held that "even if admission of [a coconspirator statement] violate[s] New York law—which unlike federal law requires independent indicia of reliability for a co-conspirator's statement—the statement does not offend the federal Confrontation Clause if it falls within Rule 801(d)(2)'s co-conspirator exception." *Bartlett,* 98 F.3d at 728. Thus, the Court will examine only whether the statements are admissible as the statements of coconspirators under the federal exception to the hearsay rule.

 "The exception to the hearsay rule for co-conspirator statements requires that the district court find by a preponderance of the evidence 'first, that a conspiracy existed that included the defendant and the declarant; and second, that the statement was made during the course of and in furtherance of that conspiracy.'" *United States v. Padilla,* 203 F.3d 156, 161 (2d Cir.) (quoting *United States v. Gigante,* 166 F.3d 75, 82 (2d Cir.1999)) (citation omitted), *cert. denied,* 531 U.S. 832, 121 S.Ct. 86, 148 L.Ed.2d 47 (2000). While the court is free to consider the hearsay statement itself in determining whether there was a conspiracy, *see Bourjaily,* 483 U.S. at 180–81, 107 S.Ct. 2775; *Padilla,* 203 F.3d at 161, "there must be some independent corroborating evidence of the defendant's participation." *United States v. Tellier,* 83 F.3d 578, 580 (2d Cir.), *cert. denied,* 519 U.S. 955, 117 S.Ct. 373, 136 L.Ed.2d 262 (1996); *accord Padilla,* 203 F.3d at 161. The existence of and membership in a conspiracy are initial questions of fact. *See, e.g., Bourjaily,* 483 U.S. at 175, 181, 107 S.Ct. 2775; *United States v. Simmons,* 923 F.2d 934, 945 (2d Cir.), *cert. denied,* 500 U.S. 919, 111 S.Ct. 2018, 114 L.Ed.2d 104 (1991). Thus, for purposes of federal habeas review, the trial court determination on this score is presumed correct unless it is rebutted by clear and convincing evidence. *See* 28

U.S.C. § 2254(e)(1); *Bartlett*, 98 F.3d at 728 ("Under federal law, which governs [ ] § 2254 habeas claims, a trial court need only find by a preponderance of the evidence that a conspiracy existed, a factual finding which we will not disturb absent clear error.").

 Here, Haywood has not met his burden of proving by clear and convincing evidence that the trial court incorrectly concluded that these statements were those of coconspirators. First, the evidence adduced at trial showed a single conspiracy to murder DeJesus that included both Haywood and Ocasio. In addition to the challenged statements themselves, Ortiz testified that Haywood told him shortly before the shooting that he "was going to kill the lady" for which he was going to be paid five thousand dollars. (Ortiz: Tr. 475–76). The evidence further showed that Ortiz, Haywood, Ocasio and Rivera then met Diaz and got into Diaz's jeep; that Diaz gave Haywood a gun and told him that "you got to kill the lady;" that DeJesus was killed shortly thereafter; that Diaz's jeep was seen at the murder scene; that Rivera was subsequently identified as the shooter; and that Ortiz saw Rivera return the gun to Diaz, after which Diaz gave money to both Rivera and Haywood. Taken together, this evidence demonstrates the existence of a conspiracy in which both Ocasio and Haywood took part.

 There was also evidence establishing that the statements were made during the course and in furtherance of the conspiracy. In making this determination, the Court is mindful that "idle chatter between coconspirators does not further a conspiracy." *Simmons*, 923 F.2d at 945 (citations omitted). Rather,

> [t]o be "in furtherance" of a conspiracy, the statements must in some way have been designed to promote or facilitate achievement of the goals of that con-

spiracy, as by, for example, providing information or reassurance to a coconspirator, seeking assistance from a coconspirator, or by communicating with a person who is not a member of the conspiracy in a way that is designed to help the coconspirators to achieve the conspiracy's goals.

*United States v. Rivera*, 22 F.3d 430, 436 (2d Cir.1994) (citations omitted); *accord United States v. Rastelli*, 870 F.2d 822, 837 (2d Cir.1989) ("in furtherance" requirement satisfied where the statement between coconspirators, *inter alia*, "provide[s] reassurance, serve[s] to maintain trust and cohesiveness among them, or inform[s them] of the current status of the conspiracy") (citations and quotations omitted).

Here, the evidence showed that the three statements were made during the course and in furtherance of the conspiracy. With respect to the timing of the statements, they were each made prior to the realization of the overall goal—namely, the murder of DeJesus—and thus unquestionably were made during the course of the conspiracy. With respect to the "in furtherance" requirement, the First and Second Statements were "in furtherance" of the conspiracy because they were reasonably designed to impress Ortiz so that he could be persuaded to join the conspiracy and act as the "look out." *See, e.g., United States v. Tracy*, 12 F.3d 1186, 1196 (2d Cir.1993) ("in furtherance" requirement satisfied where statement seeks to "prompt[ ] the listener—who need not be a coconspirator—to respond in a way that promotes or facilitates the carrying out of a criminal activity"); *Simmons*, 923 F.2d at 945 (statement "in furtherance" where calculated to "induce a listener's assistance"). The trial court found as much (*see* Tr. 418–19 (First Statement admissible as it "establishes [declarant's] connec-

tion and [bona fides] as the person who could recruit the witness to be a participant. It explains the objective conspiracy and makes meaningful the subsequent conversation two days before the murder in which the witness was recruited by Carlos to be a participant."); Tr. 421–22 (Second Statement admissible as it was "directly in furtherance of the conspiracy" in that it represented an "attempt to recruit [Ortiz] and explain to [Ortiz] why the conspiracy was being carried out")), and Haywood has not produced clear and convincing evidence showing this to be error. As for the Third Statement—which relayed the discussion between Ocasio and Diaz regarding where all the conspirators were to meet prior to the murder—it was unquestionably "in furtherance" of the conspiracy as it informed the participants of the status of the conspiracy and was clearly "designed to promote or facilitate achievement of [their] goals." *Tracy*, 12 F.3d at 1196.

Haywood argues that the First Statement was not "in furtherance" of the conspiracy because there was "no allegation whatsoever that Wayne Haywood was part of the conspiracy at the time [those] . . . declarations purportedly were made by Ocasio." Pet. Mem. at 50. With the conspiracy to murder DeJesus established, however, it does not matter that Haywood joined it later because "the declarations and acts of the various members, even though made or done prior to the adherence of some to the conspiracy become admissible against all as declarations or acts of co-conspirators in aid of the conspiracy." *United States v. United States Gypsum Co.*, 333 U.S. 364, 393, 68 S.Ct. 525, 92 L.Ed. 746 (1948); *accord United States v. Ramirez*, 482 F.2d 807, 816 (2d Cir.) ("an otherwise admissible declaration of one coconspirator is admissible against members of the group who joined after the statement was made") (citations omitted), *cert. denied*, 414 U.S. 1070, 94 S.Ct. 581, 38 L.Ed.2d 475 (1973). As the Second Circuit has observed,

> "[i]t is reasonable to expect that a new recruit can be thought to have joined with an implied adoption of what had gone on before . . . where, as here, there is sound reason to believe that he joined when he was generally aware of what his new partners had been doing and saying on behalf of the enterprise."

*United States v. Badalamenti*, 794 F.2d 821, 828 (2d Cir.1986) (citation and quotations omitted).

Here, Haywood himself testified that Diaz told him as early as November that Diaz was "having a problem with a lady from Promesa" and that he wanted Haywood "to bump her off." (Haywood: Tr. 844). This admission—coupled with the fact that Haywood conceded to knowing most, if not all, of the participants in the conspiracy—provides "sound reason" to believe that he was in fact aware of what his fellow conspirators had been "doing and saying on behalf of the enterprise." *See Badalamenti*, 794 F.2d at 828. Haywood has not demonstrated by clear and convincing evidence that the trial court erred in finding that "[t]here was one conspiracy that had as its objective the death of Lillian DeJesus." (Tr. 419). As the trial court noted: "[t]he fact that [Haywood] joined that conspiracy while it was ongoing did not sever[ ] the conspiracy in two. The objectives, the main participants in the conspiracy remained the same throughout." *Id.*

Because the statements were made by a coconspirator during the course and in furtherance of the conspiracy, their admission did not violate the Confrontation Clause. Certainly, the Appellate Division's determination did not represent an "unreasonable" application of clearly established law

or an "unreasonable" determination of the relevant facts. 28 U.S.C. § 2254(d).

Having concluded the challenged statements were properly admitted as coconspirator declarations, the Court need not reach the issue of whether they were also admissible as statements against penal interest.

## III. *CONCLUSION*

Haywood's petition for a writ of habeas corpus should be denied.

### *PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report to file any written objections. *See also* Fed.R.Civ.P. 6. Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Jed S. Rakoff, 500 Pearl Street, New York, New York 10007, and to the chambers of the undersigned at 40 Centre Street, New York, New York 10007. Any requests for an extension of time to file objections must be directed to Judge Rakoff. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See Thomas v. Arn,* 474 U.S. 140, 155, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

March 21, 2003.